ELSINORE CHRISTIAN CENTER, a
California non-profit corporation,
and Gary Holmes, Plaintiffs,

v.

CITY OF LAKE ELSINORE,
a California corporation,
et al., Defendants.

No. CV 01–04842 SVW (RCX).

United States District Court,
C.D. California.

Aug. 21, 2003.

Brad W. Dacus, Citrus Heights, CA, Roman Storzer, Derek L. Gaubatz, Anthony R. Picarello, Jr., Becket Fund for Religious Liberty, Robert H. Tyler, Alliance Defense Fund, Temecula, CA, for Plaintiffs.

Jules S. Zeman, Nancy E. Lucas, Edwin J. Richards, Haight Brown & Bonesteel, Santa Ana, CA, David H. Mann, John G. McClendon, Laguna Hills, CA, for Defendants.

Adam Szubin, James D. Todd, Jr., U.S. Dept of Justice, Civil Division, Federal Programs Branch, Washington, DC, Joshua Z. Rabinovitz, U.S. Dept. Of Justice, Washington, DC, for U.S.

*AMENDED* ORDER GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, AND DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT.

WILSON, District Judge.

## I. INTRODUCTION

Plaintiffs Elsinore Christian Center and Church member Gary Holmes (collectively "Church" or "Plaintiffs") brought this action against Defendants the City of Lake Elsinore and five individual members of the City Council (collectively "City" or "Defendants") after the Lake Elsinore Planning Commission denied the Church's application for a conditional use permit ("CUP") to operate a church on 217 N. Main Street, Lake Elsinore, California (the "Subject Property," "Property," or "Site").

On June 23, 2003, the Court issued an Order granting summary judgment for Defendants as to Plaintiffs' Second Cause of Action under 42 U.S.C. § 2000cc(a) (Section 2(a) of the Religious Land Use and Institutionalized Persons Act ("RLUI-

PA")). The June 23 Order held that Defendants' denial of the CUP violated Section 2(a), but that the applicable basis for applying the provision was unconstitutional.

Plaintiffs moved for reconsideration of the June 23 Order, arguing that the Court had failed to consider whether a separate basis for applying Section 2(a) was applicable to this case. For the reasons stated in the Court's accompanying Further Order, the Court has granted reconsideration of and vacated the June 23 Order for purposes of deciding that issue.

For the reasons set forth below, Plaintiffs' Motion for Partial Summary Judgment is DENIED, and Defendants' Motion for Summary Judgment is GRANTED IN PART as to Plaintiffs' Second Cause of Action.

## II. FACTUAL / PROCEDURAL BACKGROUND[1]

### A. *Factual Summary*

The Church is currently located in the downtown area of Lake Elsinore and believes that it has been called by God to minister in that area.[2] The Church has

---

1. The facts stated in this Order are those that are in the record and before the Court. Although other proceedings in this matter suggest that circumstances have changed considerably during the two-year pendency of this action—including sale of the Subject Property to another buyer—these are the relevant facts for purposes of assessing the merits of the claims stated in the Complaint.

2. Plaintiffs in their moving papers argue for the first time that they are "called by God" to engage in religious exercise not simply in downtown Lake Elsinore, where they are currently located, but specifically "on the [Subject Property] located at 217 North Main Street." (*See* Pls.' Opp. to Def.'s Mot. for Summ. Judgment at 1.)

 Certainly, it is beyond the judicial ken to determine the "plausibility of a religious claim." *Smith*, 494 U.S. at 887, 110 S.Ct. 1595 (collecting cases); *see Ferguson v. Commissioner of Internal Revenue*, 921 F.2d 588, 589 (5th Cir.1991) ("courts may not evaluate

religious truth"). But in deciding a free exercise challenge, a court can and must determine the "sincerity" of a professed belief, i.e., that it is "truly held." *United States v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).

 It is apparent from the record and Complaint that the Church's relocation is sought primarily to ameliorate parking problems, and perhaps secondarily to afford the Church more space. (*See* Complaint ¶¶ 20–23; Planning Commission Minutes at 3; City Council Minutes at 7, 8 and 11.) During his presentation at the City Council appeal, Jim Hilbrant, the Church's pastor, indicated that Plaintiffs feel called to minister in the downtown area. (*See* City Council Minutes at 8.) The Complaint includes an allegation to the same effect, that Plaintiffs are called by God to "spread the Christian message through teaching in the downtown area of the City of Lake Elsinore." (Complaint ¶ 17.)

 But Plaintiffs are already located in downtown Lake Elsinore, indeed three blocks from

been operating downtown for more than twelve years. The Church's current location lacks on-site parking, however, and church members are forced to park on the street. Certain events—the monthly Open Air Market and the annual Lake Elsinore Classic—involve closed roads and further exacerbate parking inadequacies; some congregants are often forced to park at a considerable distance from the Church. The Church complains that these parking issues pose particular difficulties for elderly Church members and those with disabilities, and that the current facility is too small to accommodate a growing congregation. As a result, the Church seeks to relocate to the Subject Property, situated three blocks away, which is larger and possesses more parking.

The Subject Property and Church are located in downtown Lake Elsinore, an economically depressed area characterized by urban blight. The current tenant of the Property, Food Smarts, is a discount food store and recycling business. Food Smarts leases the Property from its current owner, the Elsinore Naval Military School ("School"). Because Food Smarts is a month-to-month tenant, the School is legally entitled to evict Food Smart on thirty days' notice. The School is willing to sell the Property to the Church, and the Church has entered into a purchase agreement with the School.

Both the Subject Property and the Church are located in an area of the City zoned as C–1, or "Neighborhood Commercial." The following uses are among those that may be located in C–1 zones as a matter of right: apparel stores, appliance stores, bicycle shops, food stores, florists, general merchandise stores, hardware stores, health and exercise clubs, hobby supply stores, jewelry stores, media shops, music stores, personal service establishments, pet shops, restaurants, schools for dance and music, sporting goods stores, toy shops, and sellers of vehicle parts.

The following uses may be located in C–1 zones subject to a CUP: automatic car washes, bars, churches, drive-through or drive-in establishments, arcades, gas stations, hotels, mortuaries, motels, private clubs and lodges, restaurants with outside eating areas, small animal veterinary clinics, and any other use having similar characteristics and in accord with the zone's purposes.

Additionally, the Subject Property is located in an area classified as "blighted" by the Rancho Laguna Redevelopment Project, which acts as an overlay to the City's zoning provisions. After entering into a purchase agreement with the School, the Church applied for a CUP. City staff prepared a report recommending approval of the CUP, subject to twenty-six conditions, to which the Church consented. However, the City's Planning Commission denied the CUP, citing loss of a needed service (the grocery store and recycling business), loss of tax revenue, insufficient parking at the Subject Property, and the belief that denial of the CUP would not work a substantial burden on the Church, as it could continue to operate at its present downtown location.

---

the Subject Property. Thus, the CUP denial does not impede their religious exercise in that respect. Almost two months after this case was filed, and in a departure from their position before and when it was filed, Plaintiffs asserted, through a declaration by Mr. Hilbrant, that they are called to minister specifically at the Subject Property. (*See* Decl. of J. Hilbrant, July 21, 2001, ¶¶ 15, 19.) In light of the Complaint and record (including the fact that the Church has in the past sought CUPs for other downtown locations), the Court does not consider the late-raised claim—never presented to the City itself—that Plaintiffs are called to assemble at the specific parcel of land at issue in this case, and that this calling is a central religious belief.

The Church's appeal of the CUP denial was rejected unanimously by the City Council. During the Council's hearing on this matter, City residents spoke out on both sides of the appeal. Church members described their difficulties in attending church, while downtown residents and Food Smarts employees cited the need for a grocery store within walking distance and the loss of jobs that would result if Food Smarts were evicted. Other downtown residents claimed that the presence of the Church would benefit the area.

### B. *Procedural Posture*

On May 30, 2001 the Church sued the City in an attempt to either invalidate the applicable zoning rules or compel the City to issue a CUP in this instance.

The Church alleges that (1) the City's entire zoning Ordinance, (2) the rules regarding the C–1 zones as applied to Plaintiffs, and (3) the City's denial of the Church's CUP application, violate (1) the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), (2) the U.S. Constitution, and (3) the California Constitution. The Complaint thereby presents an intricate analytical challenge, consisting of claims at three levels of generality, brought under four sections of RLUIPA, four provisions of the U.S. Constitution, and one section of the California Constitution—a total of approximately two dozen discrete yet interrelated claims.

■ "A fundamental and long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). Thus, the Court instructed the parties to focus initially on Plaintiffs' statutory claims, with specific attention to Plaintiffs' claim under Section 2(a) of RLUIPA.

Plaintiffs moved for partial summary judgment on that claim.

The City, however, moved for summary judgment on all claims, placing the entire matter before the Court. Citing the Court's attempt to focus the issues, Plaintiffs declined a full briefing on most of their additional statutory and constitutional claims, and moved for a continuance pursuant to Fed.R.Civ.P. 56(f) to permit additional discovery "and preparation" regarding certain claims. (*See* Pls.' Opp. to Def.'s Mot. for Summary Judgment at 16.) The result is a mishmash of often incongruous pleadings, which fail to join issue in important respects. Meanwhile, the United States has intervened to defend the constitutionality of RLUIPA, should the Court reach that question.

Because Plaintiffs' claim under Section 2(a) of RLUIPA was not included in their Rule 56(f) Motion, because all elements of that claim have been fully briefed by both parties, and because both parties move for summary adjudication of that claim, the Court considers it in its entirety.

### C. *Standard for Summary Judgment*

Rule 56(c) requires summary judgment when the evidence, viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Tarin v. County of Los Angeles*, 123 F.3d 1259, 1263 (9th Cir.1997). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

That burden may be met by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."

*Id.* at 325, 106 S.Ct. at 2554. Once the moving party has met its initial burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and identify facts that show a genuine issue for trial. *See id.* at 323–34, 106 S.Ct. at 2553; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

However, only genuine disputes—where the evidence is such that a reasonable jury could return a verdict for the nonmoving party—"over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505; *see also Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 919 (9th Cir.2001).

When deciding cross-motions for summary judgment, a district court retains the responsibility to examine the record to ensure that no disputed issues of fact exist, despite the parties' assurances to that effect. *Fair Housing Council of Riverside County, Inc. v. Riverside Two,* 249 F.3d 1132, 1136–37 (9th Cir.2001); *see Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030, 1038 n. 6 (9th Cir.2000).

## III. DISCUSSION—STATUTORY APPLICATION

### A. *Background of RLUIPA*

On September 22, 2000, President Clinton signed into law the Religious Land Use and Institutionalized Persons Act of 2000, 114 Stat. 803–807 (codified at 42 U.S.C. §§ 2000cc et seq.).

RLUIPA represents the latest act in an ongoing tug-of-war between Congress and the Supreme Court. In 1990, the Supreme Court decided *Employment Division v. Smith,* 494 U.S. 872, 879, 110 S.Ct. 1595,

108 L.Ed.2d 876 (1990), which held that rights under the Free Exercise Clause do not "relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).' " The Court refused to apply the balancing test employed in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), which held that government actions that substantially burden a religious practice must be justified by a compelling governmental interest. *Smith,* 494 U.S. at 883–84, 110 S.Ct. 1595. The Court concluded that *Sherbert* has been largely confined to the context in which it was decided—denial of unemployment compensation—and that, in any case, its rule does not apply to neutral laws of general applicability. *Id.* at 879, 110 S.Ct. 1595.

In direct response to *Employment Division v. Smith,* Congress in 1993 enacted the Religious Freedom Restoration Act ("RFRA"), 107 Stat. 1488 (codified at 42 U.S.C. §§ 2000bb et seq.). RFRA purported to codify the *Sherbert* test and to apply it to all government acts that "substantially burden" religious exercise, even if the burden results from a rule of general applicability. 42 U.S.C. § 2000bb–1; *see* 42 U.S.C. § 2000bb(b).

Four years later the Supreme Court struck down RFRA, at least as it relates to state and local governments,[3] in *City of Boerne v. Flores,* 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Although Congress may enforce constitutional rights pursuant to Section 5 of the Fourteenth Amendment, the Court in *City of Boerne* concluded that RFRA exceeded that limited authority by, in effect, defining rights

---

**3.** Most courts to consider the question have concluded that *City of Boerne* invalidated RFRA only as applied to state and local governments. *See Sutton v. Providence St. Joseph Med. Ctr.,* 192 F.3d 826, 832 (9th Cir.1999) (collecting cases).

instead of simply enforcing them. *See infra.*

RLUIPA was drawn in an attempt to achieve a constitutional balance. The "general rule" of RLUIPA is the same as that provided by RFRA: state action that "substantially burden[s]" religious exercise must be justified as the "least restrictive means" of furthering a "compelling governmental interest." *See* 42 U.S.C. §§ 2000cc(a)(1); 2000cc–1(a). However, RLUIPA's provisions are more narrowly directed than those of RFRA. First, RLUIPA by its terms applies only to governmental action regarding land use or institutionalized persons. *See* 42 U.S.C. §§ 2000cc; 2000cc–1. Second, within those categories, RLUIPA applies only where the substantial burden is imposed 1) in connection with a federally-funded activity; 2) where the burden affects interstate commerce; or, with respect to land use decisions, 3) where the burden is imposed in the context of a scheme whereby the state makes "individualized assessments" regarding the property involved. *See* 42 U.S.C. §§ 2000cc(a)(2); 2000cc–1(b).

### B. *42 U.S.C. § 2000cc(a): Substantial Burden on Religious Exercise*

The "general rule" of RLUIPA provides that:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—
>
> (A) is in furtherance of a compelling governmental interest; and
>
> (B) is the least restrictive means of furthering that compelling governmental interest.

. . .

42 U.S.C. § 2000cc(a)(1).

As stated, this rule applies in three contexts: (A) where the burden is imposed in a federally-funded program or activity; (B) where the burden affects, or removal of the burden would affect, interstate commerce; and (C) where the "burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes ... individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2).

Plaintiffs allege that the City "has in place formal or informal procedures ... to make individualized assessments of the proposed religious use of the Subject Property." (Compl.¶ 45.) Indeed, the City's denial of a conditional use permit is, presumably, one type of "individualized assessment" contemplated by subsection (C). *Cf. Dilaura v. Ann Arbor Charter Twp.*, 30 Fed. Appx. 501, 510 (6th Cir.2002) (subsection (C) "clearly applies" to procedure for a zoning variance). Plaintiffs also argue that denial of the CUP affects interstate commerce. (*See* Memo. in Supp. of Mot. for Prelim. Injunction at 19–20.) Defendants do not dispute that Congress intended this provision to reach land use decisions affecting commercial real estate transactions of this type, and the Court assumes that such is the case.

Thus, the Court first considers whether the land use regulation, or its implementation, "imposes a substantial burden on the religious exercise" of Plaintiffs. 42 U.S.C. § 2000cc(a)(1).

RLUIPA defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). Further, the statute expressly provides that the term "religious exercise" includes the "use, building, or

conversion of real property for the purpose of religious exercise...." 42 U.S.C. § 2000cc–5(7)(B).

■ Therefore, the effective statutory question in this regard is whether the challenged zoning regulations, or the application thereof, effect a "substantial burden" on Plaintiffs' "use of real property for the purpose of religious exercise."[4] A claimant under RLUIPA bears the burden of persuasion on this question. 42 U.S.C. § 2000cc–2(b).

■ The Court begins by considering Plaintiffs' narrowest ground of attack: the City's denial of the CUP.[5] With regard to this action, the substantial burden question is easily answered in the affirmative. The burden on the Church's use of land in this case is not only substantial, but entire. By denying the conditional use permit, the City has effectively barred *any* use by the Church of the real property in question. This is not a case where the Church's proposed use of land—equated with "religious exercise" by RLUIPA—is restricted in a minor or "unsubstantial" way (e.g., by limiting a building's size or occupancy). Rather, the denial of the CUP bars the Church's use altogether, thereby imposing the ultimate burden on the use of that land.

■ Under established free exercise jurisprudence, the question whether state action imposes a "substantial burden on religious exercise" turns largely on whether the conduct curtailed or mandated by the state would cause "an adherent to modify his behavior and to violate his beliefs." *Thomas v. Review Bd.*, 450 U.S. 707, 717–18, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). In other words, a "substantial burden on religious exercise" accrues only where compliance with governmentally dictated or proscribed behavior would cause a religious adherent to trespass on a *"central* religious belief or practice...." *Hernandez v. Commissioner*, 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766(1989) (emphasis added) (citing *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 141–142, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987)); *see Graham v. Comm'r of Internal Revenue*, 822 F.2d 844, 850–51 (9th Cir.1987) (burden must be a substantial interference with a tenet or belief that is "central to religious doctrine").

Because zoning regulations and decisions rarely bear upon central tenets of religious belief, those regulations and decisions have not generally been held under these standards to impose a substantial burden on religious exercise. *See, e.g., Christian Gospel Church, Inc. v. City and County of San Francisco*, 896 F.2d 1221, 1224 (9th Cir.1990); *Messiah Baptist Church v. County of Jefferson*, 859 F.2d 820, 824–25 (10th Cir.), *cert. denied*, 490 U.S. 1005, 109 S.Ct. 1638, 104 L.Ed.2d 154 (1989); *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. Lakewood*, 699 F.2d 303, 306–7 (6th Cir.1983); *Grosz v. City of Miami Beach*, 721 F.2d 729 (11th Cir.1983).

4. The "land use regulations" governed by RLUIPA are those that "limit[ ] or restrict[ ] a claimant's use or development of land ... if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest." 42 U.S.C. § 2000cc–5(5). Thus, the Church's contract to purchase the Subject Property affords it standing under RLUIPA, even though the Church has not yet formally acquired the property at issue.

5. As detailed *infra,* the Court concludes that the City's denial of the CUP violates Section 2(a) of RLUIPA, but that this provision is an unconstitutional enactment. Accordingly, Plaintiffs' facial and as-applied challenges under Section 2(a) are moot. Therefore, Defendants' motion for a continuance with respect to these challenges is DENIED AS MOOT.

Clearly, RLUIPA was intended to and does upset this test. By explicitly prescribing that the centrality of a religious belief is immaterial to whether or not that belief constitutes "religious exercise," *see* 42 U.S.C. § 2000cc–5(7)(A), and by definitionally equating land use with "religious exercise," *see* § 2000cc–5(7)(B), RLUIPA establishes an entirely new and different standard than that employed in prior Free Exercise Clause jurisprudence. *See Dilaura*, 30 Fed.Appx. at 508–9; *but see San Jose Christian College v. City of Morgan Hill*, 2002 WL 971779 at *1-2 (N.D.Cal. March 8, 2002) 2002 U.S. Dist. LEXIS 4517, at *4–7 (applying pre-RLUIPA "substantial burden" test to RLUIPA claim).

Although RLUIPA's legislative history suggests that "substantial burden" should be interpreted as it has been in prior case law, it is irrelevant in this case whether "substantial" means "non-trivial" or something greater. It is the Act's explicit redefinition of "religious exercise" that effects a manifest change in the analysis. Because use of land *is* "religious exercise" under RLUIPA, there can be no doubt that the City's action denying use of the Subject Property is a "substantial burden" on that use.

When the Court "finds the terms of a statute unambiguous, judicial inquiry is complete, except in 'rare and exceptional circumstances.'" *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981). Moreover, to the extent that any statutory ambiguity arises, RLUIPA mandates that the Act be construed "in favor of a broad protection of religious exercise." 42 U.S.C. § 2000cc–3(g). Therefore, notwithstanding RLUIPA's muddled legislative history, this Court is compelled to the conclusion above.

## C. *Scrutiny of the City's Decision*

█ The Church having established a prima facie case of a violation of § 2000cc(a)(1) of RLUIPA, the burden of persuasion shifts to the government to justify its actions. 42 U.S.C. § 2000cc–2(b). To satisfy its burden, the City must demonstrate both that its denial of the CUP a) is in furtherance of a compelling government interest, and b) is the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc(a)(1).

### 1) *Compelling Governmental Interest*

RLUIPA does not define "compelling governmental interest," though the legislative history indicates the phrase was taken directly from the Religious Freedom Restoration Act, and "was and is intended to codify the traditional compelling interest test." Statement of Rep. Charles T. Canady, sponsor, on the Religious Land Use and Institutionalized Persons Act of 2000, 146 Cong Rec E 1563 (2000). One of the stated purposes of RFRA was "to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 [, 83 S.Ct. 1790, 10 L.Ed.2d 965] (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 [, 92 S.Ct. 1526, 32 L.Ed.2d 15] (1972) . . . ." 42 U.S.C. § 2000bb(b).

In *Sherbert*, the Supreme Court considered South Carolina's denial of unemployment benefits to a Seventh Day Adventist who, in conformity with her religion's Sabbatarian beliefs, refused to work on Saturdays. 374 U.S. at 400, 83 S.Ct. 1790. The Court concluded that the scheme effected a burden on the adherent's religious exercise, and that any interest in avoiding abuse of or fraud on the unemployment system did not represent a "compelling state interest." *Id.* at 405–409, 83 S.Ct. 1790. "[I]n this highly sensitive constitutional area, 'only the gravest abuses, endangering paramount interests, give occasion for permissible limitation.'" *Id.* at 406; 83 S.Ct. 1790.

Employing a similarly strict standard, the Court in *Yoder* held that Wisconsin's interest in an educated citizenry was not sufficient to warrant impinging upon Amish and Mennonite religious beliefs that militate against formal education after the eighth grade. 406 U.S. at 234–35, 92 S.Ct. 1526. The Court observed that "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." *Id.* at 215, 92 S.Ct. 1526.

Indeed, the Supreme Court has identified only a few circumstances manifesting interests that satisfy the compelling interest test when applied in the free exercise context. *See United States v. Lee*, 455 U.S. 252, 259–61, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (government's interest in maintaining social security system justifies requiring contribution even from those religiously opposed); *Gillette v. United States*, 401 U.S. 437, 462, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971) (interests in enforcing military draft justify burden on religious objectors); *Braunfeld v. Brown*, 366 U.S. 599, 607, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961) (state interest in day of repose for all workers justifies Sunday closing law despite incidental burden on those who observe Saturday as day of rest). Even significant governmental interests will not necessarily rise to the requisite level. *See, e.g., Church of the Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520, 546, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (free exercise interests of church that practices animal sacrifice warrant invalidating ban on the practice founded on city's proffered interests in protecting against health risks, animal cruelty, emotional injury to child witnesses, etc.).

In practice, however, the "compelling interest" test of *Sherbert* has rarely been applied in free exercise cases. *See Employment Division v. Smith*, 494 U.S. at 882–85, 110 S.Ct. 1595 (noting that *Sher-*

*bert* has only occasionally been applied outside the context of unemployment compensation). Nonetheless, applications of the test in other constitutional arenas confirm the weightiness of those interests traditionally held to satisfy it. *See, e.g., Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549, 107 S.Ct. 1940, 95 L.Ed.2d 474 (1987) (remedying discrimination against women and racial minorities); *United States v. Paradise*, 480 U.S. 149, 167, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (same); *Reno v. ACLU*, 521 U.S. 844, 863 n. 30, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (protecting minors from "indecent" and "patently offensive" speech); *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 677, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (avoiding disclosure of sensitive governmental information); *Press–Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 510, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984) (same); *Bush v. Vera,* 517 U.S. 952, 977, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996) (assuming enforcement of Voting Rights Act is compelling interest); *Federal Election Comm'n v. National Conservative Political Action Committee*, 470 U.S. 480, 500–1, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) (preventing corruption); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 633, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) (regulating railway safety).

It is not clear, however, that the expectation of such a strict standard of review was universally held. Senators Hatch and Kennedy included in the legislative history an ambiguous invocation that "[t]he compelling interest test is a standard that responds to facts and context." Hatch–Kennedy Statement, 146 Cong. Rec. S 7774, at *7775. In striking down RFRA, which contained an identical "compelling governmental interest" test, the Supreme Court offered the following enigmatic dicta: "Even assuming RFRA would be inter-

preted in effect to mandate *some lesser test,* say one equivalent to intermediate scrutiny, the statute would nevertheless require searching judicial scrutiny...." *City of Boerne v. Flores,* 521 U.S. 507, 534, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (emphasis added).

With these conflicting signposts in mind, the Court turns to the question whether the City's decision in this case was "in furtherance of a compelling governmental interest."

During its hearing on this matter, the Lake Elsinore City Council articulated three principal bases for its denial of the conditional use permit: 1) maintaining needed services provided by the Site's current tenant (a discount food store and recycling center); 2) preventing a loss of property tax revenue by replacing a commercial tenant with a non-commercial user; and, 3) the possible inadequacy of on-site parking for the Church's proposed use, and potential adverse consequences on the parking needs of adjacent users. (*See* Compl., Exh. D, City Council Minutes— March 13, 2001 [hereinafter City Council Minutes] at 29.)

The City now offers a post hoc articulation of its interests as "curbing urban blight, preserving the sole food market in an underprivileged low-income area, preserving jobs in the same area, [and] generating tax revenue for the use [of] all [City residents]." (*See* Defs.' Opp. at 15.) Thus, the City no longer argues that avoidance of (speculative) parking difficulties constitutes a compelling interest, and the Court doubts that such a showing could be made. (*Id.*)

Nor does an interest in maintaining tax revenue justify the City's decision. The maintenance of property tax revenue is a potentially pretextual basis for decision-making that appears to have been a specific target of RLUIPA. *See* Report of the House Committee on the Judiciary (House

Rep. 106–219) (July 1, 1999), at text accompanying n. 79 (cited in Hatch–Kennedy Statement, 146 Cong. Rec. S 7774, at *7775). The Act's drafters were concerned that where, as here, a church is required to seek a permit, "[t]he zoning board [does] not have to give a specific reason [for denying the permit]. They can say it is not in the general welfare, or they can say you are taking property off the tax rolls." *Id.* Indeed, if a city's interest in maintaining property tax levels constituted a compelling governmental interest, the most significant provision of RLUIPA would be largely moot, as a decision to deny a religious assembly use of land would almost always be justifiable on that basis.

Thus, the only potentially compelling interest is that characterized by the City as "curbing urban blight" (i.e., maintaining the only food market in an economically depressed area, and avoiding loss of jobs). The Supreme Court has long acknowledged the importance of municipal zoning objectives, including ensuring safety and security, limiting noise, and providing a favorable environment to raise children. *See Village of Euclid v. Ambler Realty Co.,* 272 U.S. 365, 394–95, 47 S.Ct. 114, 71 L.Ed. 303 (1926); *Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789, 806, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (interest in avoiding visual clutter); *Agins v. Tiburon,* 447 U.S. 255, 261, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (controlling urban sprawl). More significantly, as the Court has recognized in the First Amendment context, "a city's 'interest in attempting to preserve the quality of urban life is one that must be accorded high respect.'" *Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 50, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (quoting *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 71, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976)).

Of course, such observations do not equate to holdings that the interests are "compelling." *See Walnut Properties v. Whittier,* 808 F.2d 1331, 1335–36 (9th Cir. 1986). It seems apparent, however, that concerns regarding the vitality of city life are of paramount importance in land use planning. *See Murphy v. Zoning Comm'n,* 148 F.Supp.2d 173, 190 (D.Conn. 2001) ("local governments have a compelling interest [under RLUIPA] in protecting the health and safety of their communities . . . .").

Moreover, the interests claimed here go beyond merely preserving the quality of urban life. Rather, the City's proffered interest is in combating the economic and social ravages of blight—an interest underscored by comprehensive federal and state legislation with related objectives. *See* Housing Act of 1954, Pub.L. No. 68–560, 68 Stat. 590 (1954) (amended by various enactments 1955–1987); California Community Redevelopment Law ("CRL"), Cal. Health and Safety Code §§ 33000 et seq. In fact, the C–1 zone at issue is classified as "blighted" by the Rancho Laguna Redevelopment Project, a "legislative body" under the CRL, and is thus "conclusively presumed" to be a blighted area under California law. *See* Cal. Health and Safety Code § 33368. Among the conditions of blight identified by the California legislature are a lack of necessary facilities, including grocery stores, and an abnormally high proportion of business vacancies. *See* Cal. Health and Safety Code §§ 33031(b)(2–3).

"Indeed, the more desperate the endeavor the more economically attractive the area is to alternate land users and the more compelling the City's need to exclude them if it is to have any chance to succeed." *International Church of the Foursquare Gospel v. City of Chicago Heights,* 955 F.Supp. 878, 881 (N.D.Ill. 1996) (upholding, against RFRA challenge, city's decision to deny special use permit to church seeking to occupy abandoned commercial structure).

However, even assuming, without deciding, that curbing urban blight is a "compelling interest" under RLUIPA, it is not sufficient for the City simply to identify a compelling interest. Rather, the City must show that the challenged decision was "in furtherance" of that interest. *See* 42 U.S.C. § 2000cc(a)(1).

As with the other elements of the test, the "in furtherance" phrase is not defined by RLUIPA. Nonetheless, the language presumably requires a causal nexus between the proffered interests and the action that purportedly advances them.

It is on this issue that there is a critical disjunction between the City's action and the relevant interests. Food Smarts is merely a month-to-month tenant of the Site's current owner, Elsinore Naval and Military School. In fact, the record indicates that the School does not intend to enter into a lease or long-term arrangement with Food Smarts, and, indeed, "will evict Food Smarts, if necessary, to sell the property." (*See* Pls.' Mot. for Preliminary Injunction, Dec. of Rose M. Moore, ¶ 3.) Thus, the only evidence on this point is that the City's denial of the CUP will almost assuredly *not* guarantee the services and jobs the City claims to be preserving by way of its decision. Given its burden with respect to this issue, the City has failed as a matter of law to establish that its decision was "in furtherance" of the purportedly compelling interests upon which it relies.

### 2) *Least Restrictive Means*

Moreover, even if the City could show its decision was in furtherance of compelling governmental interests, it also has the burden of demonstrating that the decision was "the least restrictive means of further-

ing" those interests. 42 U.S.C. §§ 2000cc(a)(1); 2000cc–2(b).

This provision of RLUIPA also draws from pre-*Smith* jurisprudence. *See Thomas v. Review Bd. of Indiana Employment Sec. Div.*, 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981).[6] In essence, the City must show that its interests could not be achieved by narrower state action that burdens the Church to a lesser degree. *Hialeah*, 508 U.S. at 546, 113 S.Ct. 2217; *see Sherbert*, 374 U.S. at 408, 83 S.Ct. 1790 (test is whether "no alternative forms of regulation" would serve the government's interests).

The City argues that the "Food Smart [sic] site is a unique parcel of property providing a specific needed service," and that the City's interests could not be furthered "absent the denial of the CUP to the plaintiff." (Def.'s Opp. at 10.) The City has failed as a matter of law to establish that this is the case.

The City has adduced no evidence that the loss of Food Smarts as a tenant at the current site will necessarily equate to the loss of Food Smarts—or a similar service—from the community. For instance, the City does not point the Court to any evidence that there are no other suitable or available lots to which Food Smarts could or would relocate, and the Court is not obligated to scour the record in search of such. *See Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996). Nor has the City demonstrated why a less burdensome alternative, such as offering alternative space to Food Smarts, would be impracticable. Nor does the City argue that it is seeking to preserve the economic utility of property uniquely suited to a specific purpose. *Cf. International Church of the Foursquare Gospel*, 955 F.Supp. at 881.

For the City to carry its burden, it must demonstrate that approval of the CUP would necessarily entail dislocation of the assertedly vital use from the area, and thus that denial of the CUP is the least restrictive means of preventing that dislocation. The City has not identified any evidence that this is the case here, and thus fails as a matter of law to show that the CUP denial is the "least restrictive means" of advancing its interests.

The City fails to carry its burden for an additional reason. As elucidated above, the relevant ground for denying the CUP was justified by the City Council based principally upon its conclusion that "replacement of the present retail use with [the Church] would result in the loss of a needed service and recycling center serving the general public." (City Council Minutes at 29.) Even if the City had carried its burden or raised a material issue with respect to this contention, the City has adduced no evidence that this "needed service" is necessarily inferior to those services provided by the Church, and thus that denying the CUP is the least restrictive means of "curbing blight." (*See supra.*)

The City cites a provision of the California Redevelopment Law as evidence that preserving grocery stores is critical to curbing blight. That same law suggests, however, that unsafe and unhealthy buildings are also characteristic of blight. *See* Cal. Health and Safety Code § 33031(a)(1). And City staffers have acknowledged that the Church might improve the Subject Property upon occupying it, and is otherwise likely to ameliorate the area's condition:

---

**6.** Although RFRA—and, derivatively, RLUIPA—purport to codify "the compelling interest test as set forth in [*Sherbert* and *Yoder*]," *see supra*, the "least restrictive means" language does not appear in either case. *See City of Boerne*, 521 U.S. at 535, 117 S.Ct. 2157 (making this observation with respect to RFRA).

The proposed project could improve the appearance of this northern edge of the Historic District and could assist in revitalization of the area. Another possible, indirect economic benefit to the City could be the number of new persons brought to this section of the City that may not normally visit the area. These people could be potential customers for restaurants and retail shops on Main Street.

(Compl., Exh. A., City of Lake Elsinore Report to Planning Commission and Design Review Committee Meeting of February 21, 2001 [hereinafter Feb. 21 Planning Commission Report] at 4.)

At the subsequent Planning Commission meeting denying the CUP, one commissioner observed that the Commission "does not win tonight no mater what [we] decide," and agreed that "both [Food Smarts and the Church] provide valuable services." (*See* Feb. 21 Planning Commission Report at 6.) Another concluded that "the church has done wonderful things, but so has Food Smarts." (*Id.*) Members of the City Council evinced similar ambivalence in their comments prior to denying the City's appeal. (*See* City Council Minutes at 26–29.)

The Court need not opine on which is the better course for improving the area's vitality and curbing blight. Under RLUIPA, it is the City's burden to show that its regulation is the *least restrictive means* of advancing a compelling governmental interest. The undisputed facts indicate that, as between two users with services that City officials concede could both advance the same general interests, the City chose the alternative *most* burdensome on Plaintiffs' "religious exercise" under RLUIPA.

Therefore, the City's denial of a CUP in this instance fails the strict scrutiny analysis required by RLUIPA.

## IV. DISCUSSION—CONSTITUTIONALITY

The City argues, however, that Section 2(a) of RLUIPA represents an unconstitutional exercise of congressional authority. "Under our Constitution, the Federal Government is one of enumerated powers. *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819); *see also* The Federalist No. 45, p. 292 (C. Rossiter ed. 1961) (J. Madison). The judicial authority to determine the constitutionality of the laws, in cases and controversies, is based on the premise that the 'powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written.' *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803)." *City of Boerne,* 521 U.S. at 516, 117 S.Ct. 2157.

As noted *supra,* RLUIPA's general rule is constrained by its terms to three contexts in which Congress presumed its ability to legislate: (A) where the "substantial burden" is imposed in a federally-funded activity; (B) where the burden, or its removal, affects or would affect interstate commerce; and (C) where the burden is imposed pursuant to a system in which the government makes "individualized assessments." 42 U.S.C. § 2000cc(a)(2)(A–C). Because subsection (A) is not applicable here, the Court considers only the latter two.

### A. *Fourteenth Amendment*

Section 5 of the Fourteenth Amendment authorizes Congress to "enforce, by appropriate legislation" the provisions of the Amendment. Of relevance here is Section 1, which provides that:

> No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor

deny to any person within its jurisdiction the equal protection of the laws.

U.S. Const., amend. IV, sec. 1.

■ The legislative history states that RLUIPA was intended to enforce the Free Speech and Free Exercise Clauses of the First Amendment. *See* 146 Cong. Rec. S 7774, *7775. Two arguments are made in this respect. First, Intervenor United States of America argues that RLUIPA merely codifies the standard of *Sherbert v. Verner, supra,* which purportedly applies strict scrutiny to "individualized assessments" that bear on religious practice. (*See* Intervenor United States of America's Supp. Memo. in Support of Constitutionality of RLUIPA at 5–8.) Second, it is contended that, to the extent RLUIPA exceeds existing constitutional protections, it is a valid prophylactic enactment. (*Id.* at 16–18.)

### 1) *Codification of "Individualized Assessment" Doctrine*

RLUIPA's legislative history reflects the United States's position that the Act codifies the "individualized assessment" doctrine of *Sherbert. See* 146 Cong. Rec. S 7774, *7775–76. At least three district courts have adopted this position. *See Cottonwood Christian Ctr. v. Cypress Redevelopment Agency,* 218 F.Supp.2d 1203, 1221 (C.D.Cal.2002); *Hale O Kaula Church v. The Maui Planning Commission,* 229 F.Supp.2d 1056, 1072 (D.Haw. 2002); *Freedom Baptist Church v. Township of Middletown,* 204 F.Supp.2d 857, 868 (E.D.Pa.2002).

The United States is incorrect for two reasons.

First, the Supreme Court has never invalidated a governmental action on the basis of *Sherbert* outside the context in which it was decided: denial of unemployment compensation. *Smith,* 494 U.S. at 883, 110 S.Ct. 1595; *see, e.g., Hobbie v. Unemployment Appeals Comm'n of Florida,* 480 U.S. 136, 141, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987); *Thomas v. Review Bd. of Indiana Employment Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981). *Sherbert 's* compelling interest standard has only rarely been applied by the Supreme Court in other free exercise contexts, never (to this Court's knowledge) in a land use challenge, and has always been found satisfied. *See Smith,* 494 U.S. at 883, 110 S.Ct. 1595 (citing *United States v. Lee,* 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) and *Gillette v. United States,* 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971)). Thus, there is simply no controlling Supreme Court authority that establishes what this law purports to "codify." [7]

---

7. It is telling, though certainly not dispositive, that from the whole of federal jurisprudence, the United States has identified only two pre-RLUIPA decisions (both from district courts) applying the compelling interest test of *Sherbert* to denials of land use permits. *See Keeler v. Mayor of City Council of Cumberland,* 940 F.Supp. 879 (D.Md.1996); *Alpine Christian Fellowship v. County Comm'rs,* 870 F.Supp. 991 (D.Colo.1994). If RLUIPA "codified" settled pre-RLUIPA precedent in the contentious area of land use permitting, one would expect a wealth of case law to this effect. Indeed, the near total absence of such cases likely reflects the fact that, as elucidated *supra,* Free Exercise Clause precedent does *not* require the compelling interest test be applied in this context. (This is true even if the relevant time period is limited to the decade since *Lukumi* was decided.)

Moreover, the two cited cases are distinguishable. In both, the religious claimants *already occupied* the subject properties and were seeking use permits that, if denied, would have restricted activities that were found in each case to be central to the adherents' religious practices. *See Keeler,* 940 F.Supp. at 883–84; *Alpine Christian Fellowship,* 870 F.Supp. at 994; *see also Christian Gospel Church, Inc. v. City and County of San Francisco,* 896 F.2d 1221, 1224 (9th Cir.1990) (implying a distinction of constitutional dimension between a permit decision that re-

Second, even if *Sherbert* has occasionally been applied to free exercise cases outside the unemployment compensation field, it is inapposite to challenges of this type.

As an initial matter, *Sherbert* applies only where the governmental action at issue effects a "substantial burden" on "religious practice." *See Smith*, 494 U.S. at 883, 110 S.Ct. 1595; *Sherbert*, 374 U.S. at 406, 83 S.Ct. 1790 (compelling interest test applies to state's "substantial infringement" of free exercise rights). As noted, the relevant governmental conduct in the free exercise context is that which bears upon a "*central* religious belief or practice. . . ." *Hernandez*, 490 U.S. at 699, 109 S.Ct. 2136 (emphasis added); *see also Yoder*, 406 U.S. at 221, 92 S.Ct. 1526 ("fundamental claims of religious freedom"); *Hobbie*, 480 U.S. at 141–42, 107 S.Ct. 1046; *Thomas*, 450 U.S. at 717–19, 101 S.Ct. 1425.

In *Sherbert*, for instance, the state's decision to deny unemployment benefits to a Seventh Day Adventist placed "unmistakable" pressure upon her to forego her Sabbatarian beliefs. 374 U.S. at 404, 83 S.Ct. 1790. Likewise, in *Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 537, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), the Supreme Court struck down a set of city ordinances that were clearly intended to bar animal sacrifice central to the adherents' religion. 508 U.S. at 534, 113 S.Ct. 2217.

RLUIPA, in contrast, self-consciously defines religious exercise *far* more expansively. *See* 42 U.S.C. § 2000cc–5(7)(A) (defining "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief"); § 2000cc–5(7)(B) (religious use of land constitutes "religious exercise"). As discussed *supra*, a burden on a religious assembly's use of land does not generally impinge upon a central tenet of religious belief, and thus has not been subjected to heightened scrutiny under the Free Exercise Clause. RLUIPA was quite clearly designed to—and does—impose a different standard.

Furthermore, to the extent that there is a general rule derivable from *Sherbert*, it is that, "in circumstances in which individualized *exemptions* from a general requirement are available, the government 'may not refuse to extend that system to cases of 'religious hardship' without compelling reason.'" *Church of Lukumi*, 508 U.S. at 537, 113 S.Ct. 2217 (quoting *Smith*, 494 U.S. at 884, 110 S.Ct. 1595 and *Bowen v. Roy*, 476 U.S. at 708, 106 S.Ct. 2147) (emphasis added). In *Church of Lukumi*, for instance, the Supreme Court decided that, by exempting certain nonreligious slaughter from a general prohibition against animal killing, while refusing to do so for cases of religious sacrifice, the city's actions were subject to, and failed, the compelling interest test of *Sherbert*. *Id.* at 537–38, 83 S.Ct. 1790 (citing *Smith*'s reference to the *Sherbert* principle). Likewise, exemptions from an unemployment compensation scheme cannot be granted for secular reasons but denied in cases of religious hardship. *Sherbert*, *supra*.

Land use permitting is not an analogous case. In determining whether to issue a zoning permit, municipal authorities do not decide whether to *exempt* a proposed user from an applicable law, but rather whether the general law *applies* to the facts before it. In this case, for instance, no users are "exempt" from the C–1 zoning rules. Rather, certain commercial users may locate in C–1 zones as a matter of right, while non-commercial users, including churches, must seek a permit. Thus, the Church is simply subject to the same permitting rules as all other users. This

stricts current practice, and one that "prevents a change in religious practice").

highlights the difference between "individualized *exemptions*" (at issue in *Lukumi* and *Sherbert*) and "individualized *assessments*" (governed by RLUIPA). If the latter category were subject to strict scrutiny, many if not most governmental decisions affecting religious actors would fail judicial review, and the rule of *Smith* would have virtually no effect.

Moreover, even if a city's conditional use permit process could be characterized as a system of "individualized exemptions" from the general zoning rules (a characterization more apt for zoning variances), a codification of *Sherbert* would require some indication that the city had "refuse[d] to extend that system to cases of 'religious hardship.'" *Church of Lukumi*, 508 U.S. at 537, 113 S.Ct. 2217. For instance, if Plaintiffs here alleged or could show that the City refuses to consider claims of religious hardship on the same footing as non-religious factors in the CUP process, the City's refusal might be subject to the heightened scrutiny of *Sherbert* and *Lukumi*. But Section 2(a) of RLUIPA requires no such thing. Rather, a land use decision is subject to strict scrutiny review under that provision merely because it is an "individualized assessment," not because it fails to take religious hardship into account.

As this Court has previously observed, "[i]t is highly unlikely that Congress intended the RLUIPA to be meaningless." (July 11, 2001 Order at 23.) Rather than codifying precedent, RLUIPA mandates a sea change in the relevant standard of review. Under RLUIPA, a church's *status* as a religious institution entitles it to strict scrutiny review of any governmental action restricting its religious use of land, regardless of the degree to which that action fails to take account of religious hardship, or relates to or impinges upon the church's central religious beliefs or mission. Accordingly, Section 2(a) of RLUIPA cannot be said to effect a simple "codification" of existing constitutional law.

### 2) *Prophylactic Enactment*

To the extent that RLUIPA exceeds mere "codification" of current precedent, the United States also argues that the law is a valid prophylactic enactment under Section 5 of the Fourteenth Amendment. (*See* Intervenor's Supp. Memo. at 16–18.) *See also* 146 Cong. Rec. S 7774, *7775 (legislative history to this effect).

█ Indeed, Congress has wide authority under Section 5 to deter and remedy perceived constitutional violations. *See, e.g., Fitzpatrick v. Bitzer*, 427 U.S. 445, 455, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). This is true even where Congress acts prophylactically, thereby also prohibiting conduct that is not itself unconstitutional, or where such enactments intrude into "'legislative spheres of autonomy previously reserved to the States.'" *City of Boerne*, 521 U.S. at 518, 117 S.Ct. 2157 (quoting *Bitzer*, 427 U.S. at 455, 96 S.Ct. 2666); *accord Nevada Department of Human Resources v. Hibbs*, 538 U.S. 721, ——, 123 S.Ct. 1972, 1977, 155 L.Ed.2d 953 (2003).

Congress's Section 5 authority is not absolute, however, and is a particularly tenuous basis upon which to found RLUIPA. Congress explicitly relied upon its Fourteenth Amendment enforcement power in enacting RFRA. *See City of Boerne*, 521 U.S. at 516, 117 S.Ct. 2157 (citing Religious Freedom Restoration Act of 1993, S.Rep. No. 103–111, pp. 13–14 (1993) (Senate Report); H.R.Rep. No. 103–98, p. 9 (1993) (House Report), U.S.Code Cong. & Admin. News 1993, p. 1892). And the Supreme Court in *City of Boerne* struck down RFRA, as applied to the States, as exceeding that power.

While Congress may act to remedy or deter constitutional violations, the Court in

*City of Boerne* animated a key distinction between remedying and defining constitutional rights. Congress "has been given the power 'to enforce,' not the power to determine what constitutes a constitutional violation. Were it not so, what Congress would be enforcing would no longer be, in any meaningful sense, the 'provisions of [the Fourteenth Amendment].'" *City of Boerne*, 521 U.S. at 519, 117 S.Ct. 2157. In short, "*City of Boerne* confirmed [ ] that it falls to [the courts], not Congress, to define the substance of constitutional guarantees." *Hibbs*, 123 S.Ct. at 1977.

For an exercise of Congress's Section 5 power to be constitutional, two conditions must be met: 1) Congress must identify a "widespread and persisting deprivation of constitutional rights" which it is acting to remedy or deter; and 2) there must be "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *City of Boerne*, 521 U.S. at 519–20, 526, 117 S.Ct. 2157; *accord Board of Trustees v. Garrett*, 531 U.S. 356, 365, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001); *Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 82, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000).

#### a) *Legislative Findings*

Unlike the record attending the Voting Rights Act, which represents a valid exercise of Congress's Fourteenth Amendment enforcement powers, RFRA's legislative history was notably deficient in its failure to identify even a single generally applicable law passed because of unconstitutional bigotry. *City of Boerne*, 521 U.S. at 530, 117 S.Ct. 2157. Apparently mindful of this deficiency, RLUIPA's sponsors stated that "the committees in each house have examined large numbers of cases, and the hearing record reveals a widespread pattern of discrimination against churches as compared to secular places of assembly...." 146 Cong. Rec. S 7774, *7775.

In fact, the hearing record consists of a relatively small number of anecdotal instances in which religious assemblies were dissatisfied with zoning decisions or regulations, few of which constitute state or municipal action of a clearly unconstitutional character.[8] *Cf. Hibbs*, 123 S.Ct. at 1980–82 (identifying widespread pattern of discriminatory family leave laws, which favored female employees, in a decision upholding across-the-board provisions of federal Family and Medical Leave Act as applied to state employers). Nonetheless, Congress is the body constitutionally appointed to decide in the first instance "whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment," and thus its conclusions are entitled to great deference. *Kimel*, 528 U.S. at 80–81, 120 S.Ct. 631 (quoting *City of Boerne*, 521 U.S. at 536, 117 S.Ct. 2157).

#### b) *Congruence and Proportionality*

Although the record supporting RFRA was scant, this was not the principal basis upon which *City of Boerne* was decided. 521 U.S. at 531, 117 S.Ct. 2157 ("lack of support in the legislative record ... is not RFRA's most serious shortcoming"). Rather, RFRA was "so out of proportion to a supposed remedial or preventive object that it [could not] be understood as responsive to, or designed to prevent, unconstitutional behavior." *See City of Boerne*, 521 U.S. at 532, 117 S.Ct. 2157.

---

**8.** The Court takes judicial notice of the Brief Amicus Curiae of the National League of Cities, International Municipal Lawyers Association, The Alabama Preservation Alliance, City of Huntsville, AL, City of New Milford, CT and Village of Kings Point, NY, filed in *Civil Liberties Union for Urban Believers v. Chicago*, No. 01–4030 (7th Cir.), at notes 6–10 and accompanying text (detailing weaknesses in RLUIPA's legislative record), *available at* http://www.ca7.uscourts.gov/briefs.htm.

Section 2(a) of RLUIPA suffers precisely the same infirmity.

To be sure, RLUIPA is more narrowly directed than RFRA: it applies only to decisions and regulations affecting either land use or institutionalized persons. But as with RFRA, and in contrast to, e.g., provisions of the Voting Rights Act upheld by the Supreme Court, RLUIPA's effect is not confined to a specific type of law (or zoning regulation) "with a long history as a 'notorious means'" of effecting unconstitutional discrimination, nor is it limited in geographic breadth or duration. *Id.* at 533, 117 S.Ct. 2157. While such limitations are not required, they "tend to ensure Congress' means are proportionate to ends legitimate under § 5." *Id.; see also Hibbs,* 123 S.Ct. at 1983–84.

The failure to cabin RLUIPA's operation is exacerbated by the strict scrutiny standard it imposes. So searching is the judicial inquiry under this test that at least two Justices of the Supreme Court have questioned whether, or concluded that, it is "strict in theory, but fatal in fact." *Fullilove v. Klutznick,* 448 U.S. 448, 507, 519, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980) (Powell, J., concurring, and Marshall, J., concurring in the judgment). Although this likely is not modernly accurate, *see Grutter v. Bollinger,* 539 U.S. 306, 123 S.Ct. 2325, 2338, 156 L.Ed.2d 304 (2003), Section 2(a) of RLUIPA does place a nearly, even if not entirely, insuperable barrier before States and municipalities attempting to justify actions that, far more often than not, are neither motivated by religious bigotry nor burdensome on central religious practice or beliefs.

The Supreme Court's observations in *City of Boerne* echo here:

> Requiring a State to demonstrate a compelling interest and show that it has adopted the least restrictive means of achieving that interest is the most demanding test known to constitutional law. If 'compelling interest' really means what it says ... many laws will not meet the test.
>
> ...
>
> RFRA's substantial burden test, however, is not even a discriminatory effects or disparate impact test. It is a reality of the modern regulatory state that numerous state laws, *such as the zoning regulations at issue here,* impose a substantial burden on a large class of individuals. When the exercise of religion has been burdened in an incidental way by a law of general application, it does not follow that the persons affected have been burdened any more than other citizens, let alone burdened because of their religious beliefs. In addition, the Act imposes in every case a least restrictive means requirement—a requirement that was not used in the pre-*Smith* jurisprudence RFRA purported to codify—which also indicates that the legislation is broader than is appropriate if the goal is to prevent and remedy constitutional violations.

*City of Boerne,* 521 U.S. at 533–35, 117 S.Ct. 2157 (internal citations and quotation marks omitted; emphasis added).

These concerns rise with greater force in the case of RLUIPA, where "religious exercise" is defined to include any current or prospective religious land use by a person or religious institution. As noted *supra,* the drafters of RLUIPA self-consciously defined protected religious exercise far more broadly than it has been interpreted previously, vis-à-vis land use, by the Supreme Court. Further, the Act does not simply require States and localities to justify burdens on that use with, for instance, "substantial governmental interests." Rather, governmental decisions under RLUIPA must be the least restrictive means of advancing a compelling governmental interest. In other words, they

are subject to the single most searching standard of judicial inquiry and one historically reserved for restrictions on the core exercise of fundamental constitutional rights.

By vastly expanding the types of exercise protected by the most exacting standard of review, Congress has effectively redefined the First Amendment rights it is purporting to enforce. The result is likely to be, as in this case, that many land use decisions risk being invalidated despite being legitimately motivated, simply because the aggrieved landowner is a religious actor. Even assuming Congress has identified an area where there is a persistent minority of unconstitutional rules and decisions, the landscape is not so pervaded by religious bigotry that this blunderbuss of a remedy can be described as "congruent and proportional" to the perceived injury.

Therefore, Section 2(a) of RLUIPA exceeds Congress's power under Section 5 of the Fourteenth Amendment.

### B. Commerce Clause

■ To the extent that Section 2(a) of RLUIPA is not a valid exercise of Congress's power under the Fourteenth Amendment, the Act and its legislative history imply an alternative source of congressional authority: the Commerce Clause. *See* 42 U.S.C. § 2000cc(a)(2)(B); *see also* 146 Cong. Rec. S 7774, *7775. That Clause provides Congress with the power to regulate commerce with foreign nations, among the States, and with Indian tribes. U.S. Const. Art. 1, sec. 8, cl. 3. Pursuant to that authority, Congress may 1) "regulate the use of the channels of interstate commerce," 2) "regulate and protect the instrumentalities of," or "person or things in," interstate commerce, and 3) regulate intrastate activities where the activity has a substantial effect on interstate commerce. *United States v. Lopez,* 514 U.S. 549, 559, 561, 115 S.Ct. 1624, 131

L.Ed.2d 626 (1995). Congress's power to enact Section 2(a) of RLUIPA hinges on the third category.

In *Lopez,* the Supreme Court invalidated the Gun–Free School Zones Act, which barred possession of firearms within a "school zone." 514 U.S. at 551, 115 S.Ct. 1624. The Court held that the Act regulated conduct that is noneconomic in character, and lacked a "jurisdictional element" that "would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at 561, 115 S.Ct. 1624; *see also United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000) (striking the Violence Against Women Act on similar grounds). Moreover, it is assumed that where such a "jurisdictional element" is required, a statute's aggregate effect on interstate commerce will bring it within the radius of Congress's Commerce Clause authority, even if the conduct at issue in a given case does not itself have a "substantial" effect on commerce. *Lopez,* 514 U.S. at 561–62, 115 S.Ct. 1624; *see Camps Newfound / Owatonna v. Town of Harrison,* 520 U.S. 564, 586, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997); *Wickard v. Filburn,* 317 U.S. 111, 127–28, 63 S.Ct. 82, 87 L.Ed. 122 (1942).

Perhaps because RLUIPA regulates land use *regulation*—and is not directed to the actual commercial activities of land users—its drafters provided for just such a "case-by-case inquiry." Presumably, Congress hoped to spare RLUIPA the fate of other congressional enactments that were based on Commerce Clause power but not targeted at ostensibly economic conduct.

Accordingly, among the three contexts in which Section 2(a) applies is that where the substantial burden on religious exercise "affect[s] commerce ... among the several States...." 42 U.S.C. § 2000cc(a)(2)(B); *see* 146 Cong. Rec. S

7774, *7775. As noted *supra,* the Court assumes that a commercial real estate transaction like that sought in this case is precisely the type of commercial conduct contemplated by Congress in Section 2(a)(2)(B).

Even assuming the effect-on-commerce prong thereby limits Section 2(a)'s application to land use decisions that in turn affect commerce, however, it is still true that Section 2(a) of RLUIPA regulates land use *law* and not economic conduct. This, Congress may not do.

There are, of course, many ways in which Congress may "encourage a State to regulate in a particular way" or "influenc[e] a State's policy choices."[9] *New York v. United States,* 505 U.S. 144, 166, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). For instance, Congress may, as it does in Section (2)(a)(2)(A) of RLUIPA, attach conditions to the receipt of federal funds. *Id.* (citing *South Dakota v. Dole,* 483 U.S. 203, 206, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987)). Alternatively, where Congress has the ability to regulate private activity under the Commerce Clause, it may give States a choice between regulating that activity according to federal standards and facing federal preemption. *Id.* In the federal funding and preemption contexts, "the residents of the State retain the ultimate decision as to whether or not the State will comply.... Where Congress encourages state regulation rather than compelling it, state governments remain responsive to the local electorate's preferences; state of-

ficials remain accountable to the people." *Id.* at 168, 112 S.Ct. 2408.

 Additionally, where States themselves engage in interstate commerce, Congress may regulate them as economic actors. *See, e.g., Garcia,* 469 U.S. 528, 105 S.Ct. 1005 (upholding application of federal minimum wage and overtime standards to municipally-owned transit system).

No Supreme Court precedent stands, however, for the proposition that Congress may nakedly dictate the manner in which States regulate private conduct. *See Reno v. Condon,* 528 U.S. 141, 120 S.Ct. 666, 145 L.Ed.2d 587 (2000) (upholding law governing state disclosure of motor vehicle information because it "regulated state activities" rather than "seeking to control or influence the manner in which States regulate private parties") (quoting *South Carolina v. Baker,* 485 U.S. 505, 108 S.Ct. 1355, 99 L.Ed.2d 592 (1988) (upholding, on similar grounds, statute prohibiting States from issuing unregistered bonds)). RLUIPA appears to be unique among federal laws in purporting to do so.

As the Supreme Court has observed:

In providing for a stronger central government ... the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States ... We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit

---

9. The distinction between States and municipalities in Eleventh Amendment jurisprudence is irrelevant to the federalism analysis. *Printz v. United States,* 521 U.S. 898, 931 n. 15, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997) (citing *National League of Cities v. Usery,* 426 U.S. 833, 855–56 n. 20, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), *overruled on other grounds, Garcia v. San Antonio Metro. Transit Auth.,* 469 U.S. 528, 105 S.Ct. 1005, 83

L.Ed.2d 1016 (1985)). The Supreme Court "long ago made clear that the distinction is peculiar to the question of whether a governmental entity is entitled to Eleventh Amendment sovereign immunity...." *Printz,* 521 U.S. at 931, 117 S.Ct. 2365. Thus, for purposes of the federalism analysis in this case, a municipality is synonymous with the state that creates it.

those acts. [Citations] The allocation of power contained in the Commerce Clause, for example, *authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce.*

*New York v. United States,* 505 U.S. 144, 166, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (emphasis added).

Because Section 2(a) of RLUIPA regulates the way States regulate private parties, Congress's Commerce Clause authority is an inappropriate basis upon which to predicate its enactment.

### C. Establishment Clause

The Court need not and does not consider Defendants' argument that Section 2(a) of RLUIPA would, even if otherwise within Congress's powers, violate the Establishment Clause.

## V. CONCLUSION

42 U.S.C. § 2000cc(a), as applied in §§ 2000cc(a)(2)(B) and (a)(2)(C), was enacted without the ambit of congressional authority, and is therefore unconstitutional.

Accordingly, Plaintiffs' Motion for Partial Summary Judgment is DENIED, and Defendants' Motion for Summary Judgment is GRANTED IN PART as to Plaintiffs' Second Cause of Action under 42 U.S.C. § 2000cc(a).

IT IS SO ORDERED.