**GURU NANAK SIKH SOCIETY OF YUBA CITY, a California non-profit corporation, Plaintiff,**

v.

**COUNTY OF SUTTER, et al., Defendants.**

No. CV.S–02–1785 LKK/GGH.

United States District Court, E.D. California.

Nov. 19, 2003.

See, also, 326 F.Supp.2d 1128, 2003 WL 23676117.

Michael R Barretter, Law Office of Michael R Barretter, Yuba City, CA, for plaintiff.

Jeffrey Thomas Melching, Rutan and Tucker, Costa Mesa, CA, for defendants.

## ORDER

KARLTON, Senior District Judge.

Plaintiff, a Sikh religious organization, brings this action challenging county officials' denial of its application for a use permit to build a temple on its land, alleging violations of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA) and the U.S. Constitution. This matter comes before the court on the parties' cross-motions for summary judgment. I decide the motions on the basis of the papers and pleadings filed herein, and after oral argument.

## I.

### UNDISPUTED FACTS

Plaintiff Guru Nanak Sikh Society of Yuba City (GNSSYC) is a non-profit organization dedicated to fostering the teachings and practices of the Sikh religion. This action concerns a parcel of property that plaintiff owns in Yuba City, and on which plaintiff has sought to build a Sikh temple, or *gurudwara.* Plaintiff brings suit against the County of Sutter and its Board of Supervisors, as well as Casey Kroon, Dennis Nelson, Larry Munger and Dan Silva, each sued in their official capacities as members of the Sutter County Board of Supervisors, alleging various constitutional and statutory violations in connection with the County's denial of plaintiff's application for a conditional use permit for building the temple.

### A. THE GROVE ROAD PROPERTY

On April 4, 2001, plaintiff attempted to obtain a conditional use permit for the construction of a Sikh temple on its 1.89 acre property on Grove Road in Yuba City. The proposed use included a 2,000 square foot assembly area, 1,550 square feet dedicated to restrooms, storage and an entryway, an additional 1,500 square feet dedicated as a dining area and conversion of an existing building to be used as a commercial kitchen for temple activities. The proposed temple site would hold religious ceremonies for no more than 75 people at a time. The property was in an area designated for residential use, primarily for

large lot single family residences; in such areas, churches and temples are only conditionally permitted.

The Sutter County Community Services Department issued a report recommending that the County Planning Commission grant the conditional use permit. The report indicated that while the permit presented potential conflicts with established residences in the area, the conflicts could be minimized by specifically recommended conditions which would be consistent with the general plan. At a public meeting on April 4, 2001, however, the County Planning Commission voted unanimously to reject the conditional use permit. The rejection was apparently based on citizen objections concerning noise and traffic that was feared would interfere with the existing residential neighborhood. Following the Commission's denial, plaintiff began searching for a different parcel of property for the proposed temple.

### B. THE SUBJECT PROPERTY

In 2002, plaintiff acquired the subject property, a 28.79 acre parcel located at 1298 South George Washington Boulevard in an unincorporated area of the County, for the purposes of building a temple there (AR 1–2).[1] The site has an "AG–20" (agricultural land, 20–acre minimum lot size) designation on the Sutter County General Plan and is zoned "AG" (general agricultural district) in the Sutter County Zoning Code (AR 472). The parcel includes a walnut orchard and an existing 2,300

---

1. All citations to the administrative record are designated parenthetically with the abbreviation "AR" and the accompanying page number. To refer to the record of the proceedings before the Planning Commission and the Board of Supervisors as an administrative record is not to suggest that those proceedings are of such a character as to warrant preclusive effect, or that they are deserving of any particular deference. As I explained in

the order disposing of the defendants' motion to dismiss, preclusive effect requires the elements of fairness outlined in *United States v. Utah Construction & Mining Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966), conditions which were not met in the proceedings in the matter at bar. *See Guru Nanak Sikh Soc. Of Yuba City v. County of Sutter,* Civ. S–02–1785 (Oct. 17, 2002), slip op. at 8–11.

square foot single family residence, which the plaintiff proposed to convert into a Sikh temple by increasing the size of the building to approximately 2,800 square feet (AR 2). All of the surrounding properties, which have identical General Plan and zoning designations, are also improved with orchards (AR 27).

On January 9, 2002, plaintiff filed application number 02–01 for a conditional use permit to build a temple on the proposed site. The proposed use of the property was for a Sikh temple, assembly hall, worship services, and weddings. As before, the proposed facility was to accommodate religious services for no more than 75 people at any given time. Plaintiff also proposed to erase the lot line between the residential and the agricultural parcel so as to create one parcel (AR 1–17).

It was initially determined that the application was incomplete (AR 20–21). Plaintiff accordingly submitted additional documentation to complete the application (AR 27–32), and the project was then circulated to various Sutter County departments, departments of the City of Yuba City, and state agencies (AR 33–34). Various proposals and comments were received from those agencies (AR 36–49).

The County Community Services Department again recommended approval of plaintiff's application for a conditional use permit, including, however, certain mitigation measures to alleviate environmental concerns (AR–101). The Department's staff determined that the proposed use should be found to be consistent with the general plan. The Department's staff report states:

> Staff believes that due to the maximum attendance of 75 people at the temple, the minimal building modification necessary to accommodate the use, and with the requirement for the buffer along the north property line and the other miti-

gation measures and conditions of approval required, the proposed temple use will not conflict with existing adjacent agricultural uses. Staff believes the proposal is consistent with the general plan. Staff also believes that the proposed use will not be detrimental to the health, safety, and general welfare of persons residing or working in the neighborhood of the proposed use, or be detrimental or injurious to property and improvements in the neighborhood or to the general welfare of the county. [¶] Based on the use being consistent with the general plan and with the recommended mitigation measures and conditions of approval attached to the staff report required, staff believes the required findings can be made. Staff therefore recommends approval of Use Permit # 02–01, subject to the attached findings, mitigation measures, and conditions of approval.

(AR 106).

On April 3, 2002, the County Planning Commission held a public meeting to consider plaintiff's permit application. Sukh Singh, a member of the Guru Nanak Sikh Society, spoke on behalf of the application. Mr. Singh observed that the previous use permit had been denied on a 1.9 acre piece of land that was adjoining a neighborhood. He observed that this 28.8 acre piece of land did not border anyone's front or back yard, and indicated that the applicant was willing to accept all conditions and mitigation measures that had been recommended by the County Planning Department (AR 210). In their objections to the proposed temple, most of the opponents of the proposal cited increased traffic, conflict with agriculture and decreased property values as the reasons they did not wish to see the temple built in the proposed area (Geneal Chima AR 215–216; Michael Gibson AR 216; Thorban J. Sellers AR 217; David

Rai AR 218; Rebecca Chima AR 218). After hearing the testimony and evidence, the County Planning Commission approved the application for a use permit, subject to the mitigating conditions, by a vote of 4–3 (AR 228).

On April 5, 2002 Michael and Catherine Gibson appealed the decision of the Sutter County Planning Commission to the Sutter County Board of Supervisors. David Rai, Rebecca Chima and Geneal Chima filed a separate appeal (AR 237–248). The appeal hearing was scheduled for May 21, 2002 before the Sutter County Board of Supervisors (AR 390).

On May 10, 2002, the County Community Services Department submitted another staff report, recommending that the Board of Supervisors deny the appeal and uphold the decision of the Planning Commission to approve the permit. The recommendation was based on the Department's determination that the proposed use was consistent with the general plan and that the recommended conditions would mitigate any adverse impact on surrounding property owners.

In this report, the staff focused on addressing those issues that were raised at the Planning Commission meeting by those opposed to the project. As to impact on existing agricultural operations in the area, staff noted that a letter was received from the Sutter County Agricultural Commissioner on the date of the commission hearing which referenced concerns that the proposal may impact farmers' use of pesticides and fumigants on their crops. Staff met with the Agricultural Commissioner in an effort to address these potential impacts. Staff then added a further condition which would require a 100–foot "no development buffer" along the north, east, and south sides of the subject property. Within that buffer, no buildings related to temple use would be

allowed to be constructed. This 100–foot buffer would minimize pesticides spray drift and allow farmers on adjacent parcels to apply pesticides up to the property lines of the subject parcels. Implementation of the restriction meant that farmers would be able to continue to apply pesticides to their entire crop and not face an economic loss from being prohibited from spraying close to the property line. The site plan submitted indicates that the existing residence to be converted to the temple was located outside the buffer zone at 105 feet from the north property line. Staff further noted that fumigation of agricultural parcels is necessary every 10–15 years when replacing an orchard after its economic life has been exhausted. Fumigation requires a greater separation distance of people from the area of application than pesticide spraying. Staff recommended a condition that the applicant would comply with necessary measures, including temporarily vacating the property, to allow neighboring agricultural parcels to apply fumigants. This determination would be coordinated with the Sutter County Agricultural Commissioner who would verify the required buffer necessary at the proposed time of application and determine if the temple use needed to be temporarily vacated. The applicant would then be required to comply with the recommendations of the Agricultural Commissioner (AR 398–399).

Regarding increased traffic, the Public Works Department conducted new traffic counts after the Planning Commission meeting on George Washington Boulevard. Based upon these counts, the volume of traffic along this portion of the roadway had increased from about 2,800 vehicles per day to about 3,400 over the past three years. Since the road would continue to operate at the same level of service for a

volume between 2,500 to 4,500 vehicles per day, the increase did not change the level of service. The staff report also noted that level of service was calculated for peak hour volumes and not for daily volumes. Since the project proposed mostly traffic during off-peak hours, the staff again determined that the additional traffic generated by the temple use would not be considered significant (AR 399). In its final recommendation to the Sutter County Board of Supervisors, the staff report states:

> Staff believes that due to the maximum attendance of 75 people at the temple, the minimum building modification necessary to accommodate the use, and with the recommended mitigation measures and conditions of approval required, the proposed temple use will not conflict with existing adjacent agricultural uses. Staff believes the proposal is consistent with the general plan.

(AR 400).

On May 21, 2002, the Board of Supervisors held a public hearing on the appeal. At the hearing, the same concerns of impacts on agricultural use, impact to traffic on George Washington Boulevard and the valuation of surrounding properties was discussed. In addition, an objection was made that the project was being separated in a piece-meal fashion with the smaller project for only 75 persons being determined now versus a projected larger permanent temple on a significantly greater scale. The opponents contended that such a process was an unlawful division of the project in violation of the California Environmental Quality Act (AR 446–452). Mr. Sukh Singh again spoke on behalf of the applicant for the project and again indicated that plaintiff would agree on each and every condition recommended by the Sutter County Planning Department (AR 452–453).

After the public hearing was closed, the four supervisors voiced their opinions. Supervisor Kroon indicated he was against the project simply on an agricultural basis, the right to farm. He stated that the ability of someone to do what they have been doing for a number of years should not be impacted by someone who has just changed use of the property (AR 458). Supervisor Nelson recognized that while the property was within the "sphere of influence" of the City of Yuba City, he felt that if a church were located in an agricultural area, then other uses inconsistent with agriculture could continue and that all of these projects would be detrimental to the agriculture in the area. Supervisor Nelson said it was more appropriate to locate a church closer to the city, in an area where other churches are located (AR 459–460). Supervisor Munger indicated he also had a problem with the location. He indicated that he would not support the location because it was too far out, but would be willing to find a location which would be a better option (AR 460). Supervisor Silva objected to the location of the church as leap-frog development into a purely agricultural area (AR 460–461). After these observations, a motion was made to deny the use permit. The motion was asserted to be based upon the fact that the proposed use would conflict with agricultural operations in the area and thus would be inconsistent with existing uses in the area. A finding was also made that the proposed use would be detrimental to the health, safety and general welfare of the persons residing and working in the neighborhoods around the proposed use, and be detrimental and injurious to property improvement and the general welfare of the county (AR 461). The Board of Supervisors denied the use per-

mit by unanimous vote (AR 440, 461).[2]

## C. SUTTER COUNTY GENERAL PLAN AND ZONING CODE

The Administrative Record contains both the Sutter County General Plan (AR 468–591) and the Sutter County Zoning Code (AR 592–751). The Sutter County General Plan designates 12 land uses within the county. (AR 482–484). Of the 12 land use designations, churches are mentioned as a typical land use only within the low density residential (LDR), medium density residential (MDR) and high density residential (HDR) designations (AR 483–484). Similar uses such as social clubs, theaters, auditoriums and other specialty gathering areas are specifically mentioned within the commercial (COM) designation, while churches are not specifically mentioned within the commercial designation (AR 484).

The Sutter County Zoning Code designates 22 zoning districts within the county as well as four additional combining districts (AR 603, § 1500–410). Of these districts, each district identifies those uses which are "permitted," which uses require a "zoning clearance," and which uses require a "use permit." A permitted use is identified as a use which is allowed within the particular zoning district as a matter of right. Those uses which require a zoning clearance simply require an additional review by the Community Services Director who may issue a zoning clearance certificate (AR 710, §§ 1500–8310–8314). Those uses which are identified as requiring a use permit require that the proponent apply for a use permit through the Sutter County Planning Commission, with the requirements of a public hearing (AR 707–708, §§ 1500–8210–8220).

Of all of the districts that are created, churches are not a permitted use or permitted with a zoning clearance in any of the districts in Sutter County. Churches are allowed in six districts within the county, all with a requirement that a church obtain a use permit. These districts are general agricultural district (AG), food processing, agricultural and recreation combining district (FPARC), one-family residence district (R–1), two-family residence district (R–2), neighborhood apartment district (R–3) and general apartment district (R–4). (§§ 1500–1410, 1710, 2210, 2510, 2810 and 3110).

## D. PLAINTIFF'S CLAIMS

On August 19, 2002, plaintiff filed the instant action, alleging over twenty state and federal claims against defendants. After this motion and the previous motion to dismiss were filed, however, plaintiff voluntarily withdrew thirteen of these claims. Plaintiff's remaining claims allege that Sutter County's land use regulations, both on their face and as applied, and defendants' denial of the conditional use permit application, violate both the Free Exercise Clause and the Equal Protection Clause of the federal Constitution, and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000ee.[3]

Plaintiff alleges that defendants have deprived it and its members of their right to be free from religious discrimination and their right to free exercise of religion by

---

**2.** The minutes of the meeting also indicated that the use permit was denied on the grounds that the proposed use would create an unacceptable level of traffic on George Washington Boulevard. The oral proceedings appear to be inconsistent with the minutes on this point.

**3.** A cause of action for judicial review in accordance with California Code of Civil Procedure § 1094.5 was disposed of on defendants' motion to dismiss as barred by the statute of limitations.

treating them on terms less than equal to those enjoyed by a non-religious organization, by imposing a substantial burden on religious exercise, and by unreasonably limiting religious assemblies. Plaintiff seeks injunctive, declaratory and compensatory relief.

## II.

### SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962); *Jung v. FMC Corp.*, 755 F.2d 708, 710 (9th Cir.1985); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984).

Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" *Id.* Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Id.* at 322, 106 S.Ct. 2548. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." *Id.* at 323, 106 S.Ct. 2548.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Ruffin v. County of Los Angeles*, 607 F.2d 1276, 1280 (9th Cir. 1979), *cert. denied*, 445 U.S. 951, 100 S.Ct. 1600, 63 L.Ed.2d 786 (1980).

In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); *Matsushita*, 475 U.S. at 586 n. 11, 106 S.Ct. 1348; *First Nat'l Bank*, 391 U.S. at 289, 88 S.Ct. 1575; *Strong v. France*, 474 F.2d 747, 749 (9th Cir.1973). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *T.W. Elec. Serv., Inc. v. Pacific*

*Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505; *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1436 (9th Cir.1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *First Nat'l Bank,* 391 U.S. at 290, 88 S.Ct. 1575; *T.W. Elec. Serv.,* 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (quoting Fed.R.Civ.P. 56(e) advisory committee's note on 1963 amendments); *International Union of Bricklayers v. Martin Jaska, Inc.,* 752 F.2d 1401, 1405 (9th Cir.1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Rule 56(c); *Poller,* 368 U.S. at 468, 82 S.Ct. 486; *SEC v. Seaboard Corp.,* 677 F.2d 1301, 1305–06 (9th Cir. 1982). The evidence of the opposing party is to be believed, *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citing *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962) (per curiam)); *Abramson v. University of Hawaii,* 594 F.2d 202, 208 (9th Cir.1979). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd,* 810 F.2d 898, 902 (9th Cir.1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348 (citation omitted).

## III.

## THE RELIGIOUS LAND USE AND INSTITUTIONALIZED PERSONS ACT

Plaintiff brings three separate claims under RLUIPA, each premised on a different provision of the statute. It alleges that defendants have violated RLUIPA by (1) imposing a "substantial burden" on plaintiff's religious exercise, which is not the least restrictive means of furthering a compelling interest; (2) treating plaintiff on "less than equal terms" with nonreligious groups; and (3) imposing an "unreasonable limitation" on religious organizations.

### A. DEFENDANTS' CEQA DEFENSE

■ Before turning to the merits of each of plaintiff's RLUIPA claims, I must address defendants' contention that plaintiff has failed to comply with the California Environmental Quality Act, and that this alleged failure acts as independent bar to plaintiff's RLUIPA claims. Defendants argue that plaintiff's "failure to provide an accurate project description, coupled with the litany of evidence in the record to

support a fair argument that the project may have an impact on the environment, compelled denial of the project application. This environmental conclusion," they contend, "cannot be avoided by applying RLUIPA because Congress expressly provided that RLUIPA applies only to zoning and landmarking laws." Def's Mem. in Support of Motion for Summary Judgment at 23.

In support of this argument, defendants cite an unpublished decision, *San Jose Christian College v. City of Morgan Hill,* 2001 WL 1862224 (N.D.Cal.2001) (Whyte, J.). In that case, the defendant City had denied a rezoning application submitted by the plaintiff religious college on the grounds that the college had failed to comply with the requirements of CEQA by refusing to file a "full and complete application which disclosed the applicant's reasonably foreseeable future development plans." *Id.* at *5. The City (represented by the same counsel as defendants here) argued that compliance with CEQA requirements was a compelling state interest that justified the denial. Judge Whyte found this argument persuasive, holding that a "[a] zoning denial based on a failure to comply with environmental regulations does not on its face violate the RLUIPA" and that even if "RLUIPA was otherwise applicable to review the City's denial of [plaintiff's] zoning application, requiring the applicant to comply with the disclosure requirements mandated by the state environmental laws is a compelling governmental interest outweighing whatever modest burden has been imposed on [plaintiff's] religious exercise." *Id.*

Even assuming the soundness of the reasoning in *San Jose Christian College,* defendants' reliance on that case is unavailing here. Unlike in *San Jose Christian College,* where the City's denial was clearly based in part on the plaintiff's fail-

ure to conform to CEQA requirements, there is no evidence in this administrative record that suggests that the County's denial of plaintiff's use permit application was based on CEQA considerations. A review of the record reveals that only one of the public comments made before the Board of Supervisors concerned alleged CEQA violations. Certainly, if any such consideration formed a basis for the County's decision, it was not articulate in the Board of Supervisors' decision out of which this case arises. *See* AR at 461. Notably, nowhere in the extensive briefing submitted by the defendants is there any citation to the record that even purportedly demonstrates that, at any stage of the proceedings, the County relied on CEQA for its decision. This fact alone demonstrates why the situation in *San Jose Christian College* was entirely different from the situation here and why CEQA, even assuming the merits of Judge Whyte's reasoning, cannot stand as a bar to plaintiff's RLUIPA claims.

In sum, assuming that refusal to comply with state environmental law is a compelling local interest justifying denial of a permit for religious land use, there is no evidence that there was such a refusal or that such concerns animated the decision challenged here. Put bluntly, defendants' argument that evidence in the record could "support a fair argument that the project may have an impact on the environment" is wholly speculative. The administrative staff report found that any environmental impact could be mitigated and the Board's decision, as revealed in both written and oral form, mentions no conclusion to the contrary.

**B. "SUBSTANTIAL BURDEN" CLAIM**

Plaintiff's first claim is premised on the "general rule" of RLUIPA:

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution(A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). The statute specifically provides that this rule applies in any case in which "the substantial burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." *Id.* at § 2000cc(a)(1)(2)(c).

RLUIPA also specifies the respective burdens on the parties. "If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section [42 U.S.C. § 2000cc], the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion." 42 U.S.C. § 2000cc–2(b). The statute also provides that it is to be "construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc–3(g).

### 1. *"Religious Exercise"*

There can be no doubt that plaintiff's challenge concerns "religious exercise" within the meaning of RLUIPA. Defendants argue that plaintiff has failed to satisfy its burden because it "does not identify a single religious belief or act mandated by its faith that is inhibited (much less, substantially burdened) on account of the use permit denial. Nor does it claim or produce evidence to show that the use permit denial forced GNSSYC to act in a manner inconsistent with its religious beliefs." Def's Oppo. at 15.

This argument flies in the face of both the record and common sense. Plaintiff's permit application itself details the ways in which the temple is required to facilitate Sikh religious practices. A Sikh *gurudwara* is the repository of the Holy Book (the *Guru Granth Sahib* ). The proposed use application indicates that a priest remains in residence at the temple, that "[t]he priest ceremonially opens the Holy Book in the morning and regular daily prayers are offered. Throughout the day people can come in and pay their respect[s] to the Holy Book ... Similarly, in the evening, customary prayers are held after which the [book] is closed for the night." (AR 9). The main services are held on weekends and holidays. "Continuous reading from the Holy book for 48 hours starts on Friday morning at 10:00 AM and continues through Saturday to Sunday morning till 10:00 AM. The reading is done by experienced and learned priests or volunteers." The application also explains that the facility is needed for observance of Sikh holidays and weddings.[4]

The requirement that there be a facility for religious assembly is common and fundamental to many of the world's religions.

---

**4.** Plaintiff's briefing could have done a better job of explaining these facts and their impor-
tance, but the record is nevertheless plain in this regard.

As one pair of commentators put it, "[t]he physical embodiment of a faith group—its church—represents its ability to speak, assemble, and worship together: three fundamental rights embodied in the First Amendment." Roman P. Storzer and Anthony Picarello, *The Religious Land Use and Institutionalized Persons Act of 2000: A Constitutional Response to Unconstitutional Zoning Practices,* 9 Geo. Mason L.Rev. 929, 945 (2001). Indeed, Congress's decision to enact RLUIPA necessarily recognizes the fact that religious assembly buildings are needed to facilitate religious practice, and the possibility that local governments may use zoning regulations to prevent religious groups from using land for such purposes. It is for this reason that challenges of zoning ordinances are expressly contemplated by the statute. 42 U.S.C. § 2000cc–5(5). The use of the land does not have to be a "core religious practice." Rather, "[t]he term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). Further, the statute explicitly provides that "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. § 2000cc–5(7)(B). It cannot be gainsaid that the gathering of individuals for the purposes of worship or prayer is a use of land constituting religious exercise. The question then becomes whether such exercise is "substantially burdened" by defendants' decision to prevent plaintiff from using its land for religious exercise.

#### 2. *"Substantial Burden"*

█ Because RLUIPA is a statute of relatively recent vintage, there is little precedent interpreting its key terms. However, because the Religious Freedom Restoration Act (RFRA) and early free exercise jurisprudence imposed the requirement that plaintiffs demonstrate a "substantial burden" on their exercise of religion, those cases decided under RFRA and under the pre-*Smith* regime provide some guidance as to the meaning of this pivotal, but open-ended, statutory term. *See Marria v. Broaddus,* 200 F.Supp.2d 280, 298 (S.D.N.Y.2002)(adopting precedent interpreting "substantial burden" under RFRA in applying RLUIPA); *Charles v. Verhagen,* 220 F.Supp.2d 937 (W.D.Wis. 2002)(same).

Under that case law, it is established that a substantial burden "must be more than an inconvenience." *Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir.1995) (quoting *Graham v. C.I.R.,* 822 F.2d 844, 850–51 (9th Cir.1987), *aff'd sum nom. Hernandez v. Commissioner,* 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989)). The Supreme Court, however, has articulated the substantial burden test differently over the years. *See Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 450–51, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988); *Thomas v. Review Bd. of Ind. Employment Sec. Div.,* 450 U.S. 707, 718, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Sherbert v. Verner,* 374 U.S. 398, 404, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

In *Lyng,* the Court declared that for a governmental regulation to substantially burden religious activity, it must have a tendency to coerce individuals into acting contrary to their religious beliefs. 485 U.S. at 450–51, 108 S.Ct. 1319; *see also Thomas,* 450 U.S. at 717–18, 101 S.Ct. 1425 (holding that a substantial burden exists where the government "puts pressure on an adherent to modify his behavior and to violate his beliefs."). Conversely, a government regulation does not substantially burden religious activity when it has only an incidental effect that makes it more

difficult to practice the religion. *Id.; Thiry v. Carlson,* 78 F.3d 1491, 1495 (10th Cir.1996). Thus, for a burden on religion to be substantial, the government regulation must compel action or inaction with respect to the sincerely held belief; mere inconvenience to the religious institution or adherent is insufficient. *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996).

■ It is easy to identify these general principles, as explained by the appellate courts; it is far more difficult to discern what they mean in the real world or apply them to real facts.[5] District court cases interpreting RLUIPA since its enactment have attempted to delineate the difference between a "substantial burden" on religious exercise as opposed to a mere "inconvenience." Courts in RLUIPA land use cases have concluded that the challenged action must have a "chilling effect" on the exercise of religion to substantially burden religious exercise. *See, e.g., Shepherd Montessori Center Milan v. Ann Arbor Charter Tp.,* 259 Mich.App. 315, 675 N.W.2d 271 (2003); *Westchester Day School v. Village of Mamaroneck,* 280 F.Supp.2d 230 (S.D.N.Y.2003); *Grace*

*United Methodist Church v. City of Cheyenne,* 235 F.Supp.2d 1186 (D.Wyo.2002); *Murphy v. Zoning Commission of Town of New Milford,* 148 F.Supp.2d 173, 188–89 (D.Conn.2001). The use of term "chilling effect," however, seems inappropriate. As applied in the cases, this "chilling effect" standard is different than the ordinary meaning of those words in the free speech context from which it is derived. To meet the "substantial burden" standard, the governmental conduct being challenged must *actually inhibit* religious activity in a concrete way, and cause more than a mere inconvenience.

Whatever the difficulties with the standards' application at the margins, here, the evidence plainly indicates that the denial of the use permit, particularly when coupled with the denial of plaintiff's previous application, actually inhibits plaintiff's religious exercise. As one district court has stated in the RLUIPA context, "[p]reventing a church from building a worship site fundamentally inhibits its ability to practice its religion." *Cottonwood Christian Center v. Cypress Redevelopment Agency,* 218

**5.** Contrary to defendants' suggestion, the County's denial of plaintiff's conditional use permit application is "precisely the type of 'individualized assessment' contemplated" by RLUIPA. *Elsinore Christian Center v. City of Lake Elsinore,* 270 F.Supp.2d 1163, 1169 (C.D.Cal.2003) (Wilson, J.); *see* n. 9 *infra.* Much of the difficulty inherent in discerning the meaning of RLUIPA's "substantial burden" test in such cases, however, lies in the statute's transposition of a standard originally used in the context of individual rights to the much different context of individualized land use decisions affecting group rights. RLUIPA cases involving prisoner rights, for this reason, are much more straightforward than the sort of claim presented here.

Judge Wilson's opinion in *Elsinore Christian Center* observes that, because RLUIPA defines "religious exercise" to include land use, the statute "effects a manifest change" in the substantial burden analysis. *Id.* at 1170.

He therefore concludes that "[a]lthough RLUIPA's legislative history suggests that 'substantial burden' should be interpreted as it has been in prior case law, it is irrelevant ... whether 'substantial' means 'non-trivial' or something greater." *Id.* I cannot agree. Although the task is admittedly difficult, it is the obligation of the federal courts to attempt to construe the statute consistently with Congressional intent. The solution is not to interpret "substantial burden," as *Elsinore Christian Center* does, to encompass essentially *any* land use; rather, courts must do as Congress has instructed them to do: apply the established guideposts of "substantial burden" analysis in a new context. "[I]nfelicitous statutory language does not relieve courts of their obligation to decipher congressional intent and thereby give coherent meaning to positive law." *Dantran v. U.S. Dept. of Labor,* 171 F.3d 58, 71 (1st Cir.1999).

F.Supp.2d 1203, 1226 (C.D.Cal.2002). "Churches are central to the religious exercise of most religions. If [plaintiff] could not build a church, it could not exist." *Id.*

Plaintiff attempted to build its temple in a small plot within a residential zone, but was rejected based on noise and traffic concerns. Defendants strenuously point out that plaintiff failed to exhaust its administrative remedies with respect to the first denial. Plaintiff's decision to forego an appeal and pursue an alternative parcel of land, however, only serves to demonstrate plaintiff's good faith efforts to alleviate the concerns raised with respect to the Grove Road property. After plaintiff purchased a 30–acre property in an agricultural zone specifically for the purpose of building a temple, and specifically with zoning concerns in mind, the County's decision to deny the permit at least raises an inference of possible discrimination. *See Westchester Day School,* at *10 (court was "firmly convinced that defendants' complete denial of [plaintiff's] application was not based on any compelling governmental interest ... and that defendants' abrupt reversal and its 3–2 vote to deny plaintiff's application was a reaction to belated public outcry, a paradigm of what has been referred to as the NIMBY (Not In My Back Yard) syndrome."). RLUIPA's "substantial burden" test does not require that plaintiff actually establish discrimination, however. It is sufficient that the County's actions have had an actually inhibiting effect on plaintiff's ability to practice its religion; the sequence of events here indicates that the County's actions have had such an effect.

The facts here are similar to those in *Murphy,* where the zoning board sent a letter requiring Murphy to stop using his house for group prayer-meetings (which drew as many as 60 participants), and stating that the use of the Murphys' back-yard as a parking lot for attendees was prohibited. *Id.* at 178. The zoning ordinance in *Murphy,* like that in the instant case, allowed applicants to apply for a special use permit. The *Murphy* court found that the application of the zoning ordinance to prohibit prayer meetings violated RLUIPA, despite the fact that neighborhood aesthetics and safety were at issue, because it placed a substantial burden on free exercise rights in the use of land. *Murphy,* 148 F.Supp.2d at 187–91. The court rejected the defendants' argument that the Township was not burdening the practice of gathering for prayer in a private home by virtue of the ordinance. *Id.* at 188. While the *Murphy* court found the town's asserted interests in traffic safety and aesthetics to be compelling, it rejected the argument that the ordinance was the least restrictive means for furthering those interests. *Id.* at 189–90. Here, it is perhaps telling that the County has not even attempted to establish a compelling interest that would justify its decision.

Defendants argue that this court should adopt an extremely high threshold for establishing a substantial burden under RLUIPA, as the Seventh Circuit did in *Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752 (7th Cir.2003) (*CLUB* ). The *CLUB* majority held that "in the context of RLUIPA's broad definition of religious exercise, a land-use regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering a religious exercise—including the use of real property for the purpose thereof within the regulated jurisdiction—*effectively impracticable.*" *Id.* at 761 (emphasis added). This test reads quite a bit more into the word "substantial" than is warranted by the text, purpose or history of the statute. Indeed, such a reading would inappropriately fuse the "substantial burden" prong of RLUI-

PA with the narrower "exclusion limitation" provision. Rather than adopting the Seventh Circuit's standard, the court adopts the standards employed by the majority of the courts that have considered land use claims under RLUIPA thus far. At a minimum, a substantial burden is one which actually inhibits religious practice by virtue of a land use decision. It is clear that plaintiff has made a prima facie showing of a substantial burden.

### 3. Compelling Interest / Least Restrictive Means

Because plaintiff has established a prima facie case that RLUIPA has been violated, the burden now shifts to defendants to demonstrate that the County's actions were the least restrictive means of furthering a compelling governmental interest.

The defendants have effectively conceded this issue. Other than the CEQA argument that has already been addressed, defendants do not attempt to argue that the Supervisors' concerns about consistency with agricultural use constitute a compelling interest. Defendants' reluctance to raise such arguments is understandable, for the strict scrutiny standard imposed by RLUIPA is a difficult one to meet.

Since plaintiff has made out a prima facie case of a substantial burden on its religion, and since defendants have failed to tender a compelling local interest for the imposition of that burden, defendants denial of the use permit constitutes a violation of plaintiff's rights under RLUIPA.

### C. EQUAL TERMS AND EXCLUSION LIMITATION CLAIMS

Plaintiff also brings two additional claims based on section (b)(1) of RLUIPA, which prohibits a government from "impos[ing] or implement[ing] a land use regulation in a manner that treats a religious institution on less than equal terms with a nonreligious assembly or institution," and section (b)(3), which states that a government may not "impose or implement a land use regulation that . . . unreasonably limits religious assemblies, institutions, or structures within a jurisdiction." [6]

The meaning of these broadly worded provisions, unfortunately, is even less clear than the meaning of the "substantial burden" provision. Nor is it clear how the two sets of provisions function together. Perhaps because most cases are resolved under the "substantial burden" test, "[t]here is very little case law interpreting [these] provisions of the RLUIPA." *Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston,* 250 F.Supp.2d 961, 992 (N.D.Ill.2003). The Seventh Circuit has stated in passing that "the substantial burden and nondiscrimination provisions are operatively independent of one another." *CLUB,* 342 F.3d 752, 761. The structure of the statute, however, may suggest an alternative reading. The substantial burden provision, section (a)(1), is introduced as the "general rule" and contains limitations on the statute's jurisdiction. Sections (b)(1) and (b)(3), however, contain no jurisdictional limitations, suggesting that, contrary to the Seventh Circuit's reading, they are *subsets of the general rule,* since the jurisdictional limitations apparently apply to

---

**6.** *See* 42 U.S.C. § 2000cc(b)(1) ("No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution."); § 2000cc(b)(3) ("No government shall impose or implement a land use regulation that—(A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.").

the statute as a whole. (Indeed, it is probably necessary to read the jurisdictional limitations as applying generally in order to read the statute in a manner consistent with the Constitution.)

Relying on RLUIPA's legislative history, several courts have concluded that "[t]hese provisions codify existing Equal Protection Clause and Free Exercise Clause jurisprudence." *Petra Presbyterian Church v. Village of Northbrook,* 2003 WL 22048089 at *11 (N.D.Ill. Aug, 29, 2003); *see Freedom Baptist Church of Delaware County v. Township of Middletown,* 204 F.Supp.2d 857, 869 (E.D.Pa. 2002) (Sections (b)(1) and (b)(3) of RLUIPA "codify existing Supreme Court decisions under the Free Exercise and Establishment Clauses of the First Amendment as well as under the Equal Protection Clause of the Fourteenth Amendment").

The application of these provisions will thus undoubtedly occasion difficulties of statutory construction in future cases. Here, however, plaintiff's claims are easily addressed. Plaintiff challenges the County Zoning Code's requirement that a church be located in one of six of the county's zoning districts, and that it first obtain a use permit.

As defendants forcefully point out, the insufficiency of the record here and the nature of the zoning ordinances challenged precludes a successful facial challenge. Defendants cite *Hale O Kaula Church v. Maui Planning Commission,* 229 F.Supp.2d 1056, 1070 (D.Haw.2002). There, the court rejected a similar challenge to state zoning laws, finding that:

> [T]he state statutory provisions do not facially discriminate against religious institutions. Merely classifying land into agricultural, rural, urban and conservation districts does not discriminate

against church buildings or uses ... Plaintiffs are treated as equally as any other non-agricultural users or uses. They are not treated "on less than equal terms with nonreligious assembly or institution." To rule otherwise would exempt religious institutions from all zoning laws and this, according to RLUIPA's legislative history, clearly was not the intent of RLUIPA.

*Id.; see* 146 Cong. Rec. S7776 ("This Act does not provide religious institutions with immunity from land use regulation, nor does it relieve religious institutions from applying for variances, special permits or exceptions, hardship approval, or other relief provisions in land use regulations, where available without discrimination or unfair delay."). Plaintiffs have failed to demonstrate that the regulations themselves, as opposed to the way in which they were applied in this particular case, subject churches to "discrimination or unfair delay." They have pointed to no similarly situated entities that received disparate treatment. *See Ventura County Christian High School v. City of San Buenaventura,* 233 F.Supp.2d 1241, 1247 (C.D.Cal.2002) ("evaluating plaintiffs' claims under either RLUIPA or the Equal Protection Clause of the Fourteenth Amendment, the Court must first inquire as to whether defendants have treated plaintiffs in an unequal manner to similarly situated entities.").

Plaintiff's decision to abjure any mention of these claims in its reply brief, and the amount of space in their overall briefing devoted to these claims, suggests that plaintiff is aware that they are, at best, long-shots. In any event, in the absence of any evidence of discrimination or unreasonable limitations in the Zoning Code itself, plaintiff's claims fail.[7]

---

7. All the above is not meant to suggest that   plaintiff could not have made a serious argu-

### D. CONSTITUTIONALITY OF· RLUIPA

■ Finally, defendants argue that if the court accepts plaintiff's interpretation of RLUIPA, then the statute must be found unconstitutional because it exceeds Congress's power to legislate under Section 5 of the Fourteenth Amendment.

This court has already discussed the constitutionality of RLUIPA at length· in *Mayweathers*, 2001 WL 804140 (E.D.Cal. 2001), *aff'd sub nom.*, *Mayweathers v. Newland*, 258 F.3d 930 (9th Cir.2001). There, I rejected the argument that "RLUIPA seeks to reverse the Supreme Court's interpretation of the First Amendment's Free Exercise Clause as announced in *Employment Division, Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990)," *Id.* at *8, noting that "[w]hile Congress cannot, through. ordinary legislation, amend the Court's authoritative interpretation of the Constitution, congressional disapproval of a Supreme Court decision does not impair the power of Congress to legislate a different result, as long as Congress had that power in the first place." *Id.* (citing *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997)). In affirming, the Ninth Circuit held that "RLUIPA does not erroneously review or revise a specific ruling of the Supreme Court because the statute does not overturn the Court's constitutional interpretation in *Smith*. Rather, RLUIPA· provides *additional protection* for religious worship, respecting that Smith set only a constitutional floor—not a ceiling—for the protection of personal liberty." *Mayweathers v. Newland*, 314 F.3d 1062, 1070 (9th Cir.2002) (citations omitted). Defendants here, however, raise novel arguments. that, while certainly related to the separation of powers issues discussed in

*Mayweathers*, deserve careful and independent analysis. I therefore begin by briefly surveying the constitutional history underlying those arguments.

#### 1. *Background: Smith, RFRA, Boerne, and RLUIPA*

On September 22, 2000, President Clinton signed RLUIPA into law. There is little dispute that the statute was adopted in response to the Supreme Court's partial invalidation in 1997 of the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. §§ 2000bb–2000bb–4, in *City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). *See Freedom Baptist Church of Delaware County v. Township of Middletown*, 204 F.Supp.2d 857, 861 (E.D.Pa.2002) (Dalzell, J.).

Both statutes were a response to *Employment Div. v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), which held that the Free Exercise Clause does not "relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Id.* at 879, 110 S.Ct. 1595. The Court refused to apply the balancing test employed in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), which held that government actions that substantially burden a religious practice must be justified by a compelling governmental interest. *Smith*, 494 U.S. at 883–84, 110 S.Ct. 1595. The Court concluded that *Sherbert* has been largely confined to the context in which it was decided—denial of unemployment compensation—and that, in any case, its rule does not apply to neutral laws of general applicability. *Id.* at 879, 110 S.Ct. 1595.

ment. *See CLUB,* 342 F.3d at 755 (Posner, J., dissenting).

In direct response to *Smith,* Congress in 1993 enacted RFRA. The statute purported to codify the *Sherbert* test and to apply it to all government acts that "substantially burden" religious exercise, even if the burden results from a rule of general applicability. 42 U.S.C. §§ 2000bb–1, 2000bb(b). Four years later, the Supreme Court struck down RFRA, as it relates to state and local governments, in *Boerne.* Although Congress may enforce constitutional rights pursuant to Section 5 of the Fourteenth Amendment, the Court in *Boerne* concluded that RFRA exceeded that authority by, in effect, defining rights instead of simply enforcing them.

RLUIPA was drawn in an attempt to achieve a constitutional balance. The "general rule" of RLUIPA is the same as that provided by RFRA, in that state action that "substantially burden[s]" religious exercise must be justified as the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. §§ 2000cc(a)(1), 2000cc–1(a).

However, RLUIPA's provisions are more narrowly directed than those of RFRA. First, RLUIPA by its terms applies only to governmental action regarding land use or institutionalized persons. *See* 42 U.S.C. §§ 2000cc, 2000cc–1. Second, within those categories, RLUIPA applies only where the substantial burden is imposed: (1) in connection with a federally-funded activity; (2) where the burden affects interstate commerce; or, (3) with respect to land use decisions, where the burden is imposed in the context of a scheme whereby the state makes "individualized assessments" regarding the property involved. *See* 42 U.S.C. §§ 2000cc(a)(2), 2000cc–1(b). As I explain below, these differences require a different conclusion regarding RLUIPA's constitutionality as compared with *Boerne*'s evaluation of RFRA.

### 2. *Section 5 of the Fourteenth Amendment*

Defendants argue that RLUIPA, like RFRA, exceeds Congress's power under Section 5 of the Fourteenth Amendment, as applied to religious land use decisions.[8] In support of this argument, they rely principally on the recent decision in *Elsinore Christian Center v. City of Lake Elsinore,* 270 F.Supp.2d 1163 (C.D.Cal.2003) (Wilson, J.). There, Judge Wilson concluded that a city's denial of a user permit to operate a church violated RLUIPA, but that the section of RLUIPA governing the validity of substantial burdens on religious exercise imposed pursuant to a system in which the government makes "individualized assessments" exceeded Congress's Section 5 powers.

Defendants, like the court in *Elsinore,* do not discuss the arguments considered in *Mayweathers.* Instead, they focus on what a pair of eminent scholars has recently labeled *Boerne*'s "juricentric" holding: that Congress "has been given the power 'to enforce,' not the power to determine what constitutes a constitutional violation." *Boerne,* 521 U.S. at 519, 117 S.Ct. 2157; *see also Nevada Dept. of Human Resources v. Hibbs,* 538 U.S. 721, 123 S.Ct. 1972, 1977, 155 L.Ed.2d 953 (2003) ("*Boerne* confirmed [ ] that it falls to [the courts], not Congress, to define the substance of constitutional guarantees.").[9]

---

8. Section 5 of the Fourteenth Amendment provides that "[t]he Congress shall have power to enforce, by appropriate legislation, the provisions of this article," which include the prohibition in section 1 against "any State[s'] depriv[ing] any person of life, liberty, or prop-

erty, without due process of law," or "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, §§ 1, 5.

9. *See generally* Robert Post and Reva Siegel, *Protecting the Constitution from the People:*

Since *Boerne,* the Court has repeatedly asserted its authority over Congress in this arena. "The ultimate interpretation and determination of the Fourteenth Amendment's substantive meaning," the Court has said, "remains the province of the Judicial Branch." *Kimel v. Florida Bd. of Regents,* 528 U.S. 62, 72–73, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000) (capitalization in original). Under these precedents, legislation enacted pursuant to Section 5 of the Fourteenth Amendment which reaches beyond the scope of Section 1's actual guarantees must be an appropriate remedy for identified constitutional violations, not "an attempt to substantively redefine the States' legal obligations." *Id.* at 88, 120 S.Ct. 631.

Despite the Court's recent adherence to the "juricentric Constitution," it is worth recalling words uttered by Justice Rehnquist in a different Constitutional era, words which are just as apt here:

> Whenever called upon to judge the constitutionality of an Act of Congress— "the gravest and most delicate duty that this Court is called upon to perform," *Blodgett v. Holden,* 275 U.S. 142, 148, 48 S.Ct. 105, 72 L.Ed. 206 (1927) (Holmes, J.)—the Court accords "great weight to the decisions of Congress." *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 102, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973). The Congress is a coequal branch of government whose Members take the

same oath we do to uphold the Constitution of the United States. As Justice Frankfurter noted in *Joint Anti–Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 164, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (concurring opinion) we must have "due regard to the fact that this Court is not exercising a primary judgment but is sitting in judgment upon those who have taken the oath to observe the Constitution and who have the responsibility for carrying on government." The customary deference accorded the judgments of Congress is certainly appropriate when, as here, Congress specifically considered the question of the Act's constitutionality.

*Rostker v. Goldberg,* 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981) (opinion of Rehnquist, J., for the Court) (upholding Military Selective Service Act against gender discrimination challenge). These principles, of course, apply equally when the challenged Act of Congress is one that is designed to protect individual liberty. Moreover, it is safe to say that the unanimous Congress which enacted RLUIPA, more so than the Congress in *Rostker,* considered the constitutionality of the statute carefully and thoroughly. *See, e.g.,* 146 Cong. Rec. E1563–67 (daily ed. Sept. 22, 2000) (House legislative record, including a section-by-section analysis of RLUIPA with comparison to corresponding sections of RLPA).

---

*Juricentric Restrictions on Section Five Power,* 78 Ind. L.J. 1 (2003). Professors Post and Siegel argue persuasively that *Boerne* and its ilk signal a fundamental constitutional revolution: "The Court's recent decisions invalidating Section 5 legislation invoke the Constitution as a document that speaks only to courts. We call this vision the 'juricentric Constitution.' The juricentric Constitution imagines the judiciary as the exclusive guardian of the Constitution. It allows the Court's coordinate branches to enforce the Constitution only in-

sofar as they enforce judicial interpretations of constitutional meaning, an approach that radically circumscribes Congress's power under Section 5 of the Fourteenth Amendment." *Id.* at *2. The authors argue that "[t]he Court justifies these restrictions in a way that fundamentally misdescribes American constitutional culture, as [they] show by examining constitutional practice during the closing decades of the twentieth century, when the Court regularly looked to Congress to anchor and orient its constitutional judgments." *Id.*

In order to determine whether RLUIPA is consistent with *Boerne,* and thus whether Congress acted within its authority, it is appropriate to begin with Justice Kennedy's general discussion of Congress's remedial powers, as they relate to the states, under the Fourteenth Amendment. *Freedom Baptist Church,* 204 F.Supp.2d at 872. Throughout the *Boerne* opinion, Justice Kennedy went to great lengths to distinguish Congress's "power to remedy" and the Court's power to define constitutional rights and "say what the law is." *Marbury v. Madison,* 5 U.S. 137, 1 Cranch 137, 2 L.Ed. 60 (1803). As Justice Kennedy put it:

> Congress' power under § 5, however, extends only to "enforcing" the provisions of the Fourteenth Amendment . . . The design of the Amendment and the text of § 5 are inconsistent with the suggestion that Congress has the power to decree the substance of the Fourteenth Amendment's restrictions on the States. Legislation which alters the meaning of the Free Exercise Clause cannot be said to be enforcing the Clause. Congress does not enforce a constitutional right by changing what the right is.

*Boerne,* 521 U.S. at 519, 117 S.Ct. 2157, 138 L.Ed.2d 624.

This is a crucial and fundamental distinction going back to *Marbury.* If Congress could by statute redefine the content of constitutional provisions, *Marbury*'s distinction between the Constitution as "superior paramount law" and "ordinary legislative acts" would be obliterated. *See Marbury,* 5 U.S. at 177, 1 Cranch 137, 2 L.Ed. 60 (quoted in *Boerne,* 521 U.S. at 529, 117 S.Ct. 2157). Justice Kennedy, in striking down RFRA explained, "any suggestion that Congress has a substantive, non-remedial power under the Fourteenth Amendment is not supported by our case

law." *Boerne,* 521 U.S. at 527, 117 S.Ct. 2157.

The Court recognized that the distinction it was making based upon *Marbury* "hardly supplied a bright line for Courts." *Freedom Baptist Church,* 204 F.Supp.2d at 873. Rather, the Court explained, Congress has "wide latitude" in discerning where the line must be drawn:

> While the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies, the distinction exists and must be observed. There must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end. Lacking such a connection, legislation may become substantive in operation and effect.

*Boerne,* 521 U.S. at 519–20. The question thus becomes whether RLUIPA embodies such "congruence and proportionality" where RFRA did not.

The fatal flaw with RFRA was, in the majority's view, that the statute "appears, instead, to attempt a substantive change in constitutional protections." *Id.* at 532, 117 S.Ct. 2157. Quoting from the *Civil Rights Cases,* 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835 (1883), the Court noted that "[r]emedial legislation under § 5 'should be adapted to the mischief and wrong which the [Fourteenth] Amendment was intended to provide against.'" *Boerne,* 521 U.S. at 532, 117 S.Ct. 2157. The Court further noted, by contrast, that the "RFRA is not so confined. Sweeping coverage ensures its intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and regardless of subject matter." *Id.*

It is precisely at this point that RLUIPA critically differs from RFRA. In limit-

ing its applicability outside of the Spending and Commerce Clauses to those cases where governments make "individual assessments," the statute draws the very line *Smith* itself drew when it distinguished neutral laws of general applicability from those "where the State has in place a system of individual exemptions," but nevertheless "refuse[s] to extend that system to cases of 'religious hardship.'" *Smith*, 494 U.S. at 884, 110 S.Ct. 1595; *Freedom Baptist Church*, 204 F.Supp.2d at 873.[10] "The RLUIPA thus cannot be regarded as in any way hostile to *Smith*, as the RFRA undoubtedly was." *Freedom Baptist Church*, 204 F.Supp.2d at 873; *see also Cottonwood Christian Ctr. v. Cypress Redevelopment Agency*, 218 F.Supp.2d 1203 at 1221 (C.D.Cal.2002) (holding that because RLUIPA is based on the Spending and Commerce clauses, and the codification of current precedent on individualized assessments, RLUIPA would appear to have avoided the flaws of its predecessor RFRA, and be within Congress's constitutional authority).

Nor is RLUIPA inconsistent with *Boerne*. Unlike the "sweeping coverage" of the RFRA that ensured that statute's "intrusion at every level of government, displacing laws and prohibiting official actions of almost every description and re-

gardless of subject matters," *Boerne*, 521 U.S. at 532, 117 S.Ct. 2157, "the RLUIPA here is targeted solely to low visibility decisions with the obvious—and, for Congress, unacceptable—concomitant risk of idiosyncratic application." *Freedom Baptist Church*, 204 F.Supp.2d at 873–74. The *Freedom Baptist Church* court further reasoned that since RLUIPA's limitations and proscriptions codify firmly-established Supreme Court rights under its Free Exercise and Equal Protection jurisprudence, it does not "attempt a substantive change in constitutional protections," that led to *Boerne*'s striking down of RFRA as applied to the states. *See id.* at 870–72. The new statute thus honors *Marbury*'s distinction between the Constitution as "superior paramount law" and "ordinary legislative acts." *Id.* at 874.

To the extent that RLUIPA may cover a particular case that is not on all fours with an existing Supreme Court decision, "it nevertheless constitutes the kind of congruent and, above all, proportional remedy Congress is empowered to adopt under § 5 of the Fourteenth Amendment." *Id.* In fact, the Supreme Court noted four years after *Boerne* that "Congress is not limited to mere legislative repetition of this Court's constitutional jurisprudence, but may also prohibit 'a somewhat broader

---

**10.** It is difficult to take seriously defendants' position that the use permit requirements at issue in this case are somehow not "individualized assessments." While, as I have noted above, the analogy between pre-*Smith* individual rights case law and group rights in the land use context is not a precise one, it is nevertheless beyond cavil that zoning decisions such as the one at issue in this case are properly described as "individual assessments." *See Keeler v. Mayor of Cumberland*, 940 F.Supp. 879, 885 (D.Md.1996) (landmarking ordinance "has in place a system of individualized assessments"); *Korean Buddhist Dae Won Sa Temple v. Sullivan*, 87 Hawai'i 217, 953 P.2d 1315, 1344–45 n. 31 (1998) ("The City's variance law clearly cre-

ates a 'system of individualized exceptions' from the general zoning law."); *First Covenant Church v. City of Seattle*, 120 Wash.2d 203, 840 P.2d 174, 181 (1992) (holding that landmark ordinances "invite individualized assessments of the subject property and the owner's use of such property, and contain mechanisms for individualized exceptions."); *see also* H.R. Rep. No 106–219 at 17 ("Local land use regulation, which lacks objective, generally applicable standards, and instead relies on discretionary, individualized determinations, presents a problem that Congress has closely scrutinized and found to warrant remedial measures under its section 5 enforcement authority.").

swath of conduct.'" *Bd. of Trustees of the Univ. of Alabama v. Garrett,* 531 U.S. 356, 365, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001). Thus, unlike RFRA, RLUIPA does not "contradict [ ] vital principles necessary to maintain separation of powers and the federal balance." *Boerne,* 521 U.S. at 536, 117 S.Ct. 2157.

Finally, RLUIPA's legislative history establishes a pattern of constitutional violations occasioned by state land-use laws that is within Congress's power to remedy under Section 5. *See* Storzer and Picarello, *supra,* at 984–87 (summarizing Congressional findings). Congress "compiled massive evidence" of such violations based on nine separate hearings over the course of three years. 146 Cong. Rec. S7774 (daily ed. July 27, 2000); *see* H.R.Rep. No. 106–219, at 18–24 (summarizing hearing testimony regarding land use).[11] This evidence establishes what RFRA's record did not: a "widespread pattern of religious discrimination in this country" in land use regulation, including "examples of legislation enacted or enforced due to animus or hostility to the burdened religious practices." *Boerne,* 521 U.S. at 531, 117 S.Ct. 2157. The evidence was presented to Congress in various forms, which were cumulative and mutually reinforcing. Some evidence was statistical, including national surveys of churches, zoning codes, and public attitudes. Some was judicial, including decisions of the state and federal courts reflecting extensive constitutional violations. Congress found that "[c]hurches in general, and new, small, or unfamiliar churches in particular, are frequently discriminated against on the face of zoning codes." 146 Cong. Rec. S7774. "Sometimes," Congress found,

"zoning board members or neighborhood residents explicitly offer race or religion as the reason to exclude a proposed church ... More often, discrimination lurks behind such vague and universally applicable reasons as traffic, aesthetics, or 'not consistent with the city's land use plan'." *Id.* This evidence makes clear that what the unanimous Congress that enacted RLUIPA did was not to recalibrate substantive constitutional jurisprudence. Rather, Congress acted, with well within its Section 5 power, to remedy constitutional violations identified by overwhelming evidence.

Thus, unlike RFRA, RLUIPA was carefully crafted so as to fall within Congress's remedial powers under Section 5 of the Fourteenth Amendment. RLUIPA, both facially and as applied in this case, is a valid exercise of Congressional power.

### E. "APPROPRIATE RELIEF"

■ As redress for defendants' violation of RLUIPA, plaintiffs seek declaratory, injunctive and compensatory relief. RLUIPA provides that "a person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C.2000cc–2(a). It is readily apparent that declaratory and injunctive relief are "appropriate relief," and accordingly, the court will declare the challenged decision to be invalid and will enjoin defendants from enforcing it. *See Elrod v. Burns,* 427 U.S. 347, 373–74, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) ("The loss of First Amendment freedoms, for even minimal period of time, unquestionably constitutes irreparable injury."); *Bell v. Hood,* 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939

---

11. The notion that Congress must assemble a record that satisfies the judiciary rather than itself might seem to some a manifestation of profound disrespect for a co-ordinate branch of government. I am, of course, bound by the Supreme Court's decisions, and thus undertake the analysis of the record noted above.

(1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution."). As this court has previously noted, the issue of whether RLUIPA allows the recovery of damages is an open question. *See Mayweathers*, 2001 WL 804140, at *7. In addition to nominal damages, plaintiff seeks compensatory damages in the amount of $1,938.93 for funds deposited in connection with plaintiff's application for a conditional use permit (AR 463–65). Such funds, however, would have been expended regardless of whether the challenged constitutional violation had occurred; today's decision does not hold that the requirement to submit an application itself constituted a violation of federal law. Plaintiff, therefore, may not recover compensatory damages. Nominal damages, however, are appropriate. *See Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Thus, the court will award plaintiff nominal damages of one dollar against each defendant.

## IV.

## PLAINTIFF'S CONSTITUTIONAL CLAIMS

[8] Under the prevailing constitutional jurisprudence, the Free Exercise Clause is less protective of religious freedom than RLUIPA. *Compare* 42 U.S.C. § 20000cc-(a)(1) (prohibiting government from imposing a substantial burden on religious exercise, even if the burden results from a rule of general applicability, unless the burden furthers a compelling interest and is narrowly tailored) *with Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990) (holding that laws of general applicability that incidentally burden religious conduct do not offend the First Amendment). As discussed above, the Ninth Circuit has recently made clear

that, as compared with the Free Exercise Clause, "RLUIPA provides *additional protection* for religious worship." *Mayweathers v. Newland*, 314 F.3d 1062, 1070 (9th Cir.2002) (citations omitted) (emphasis added).

Thus, if plaintiff's claims could not succeed under RLUIPA, they surely could not succeed under the Free Exercise Clause. *Cf. Charles v. Verhagen*, 220 F.Supp.2d 937, 952 (W.D.Wis.2002) ("Because plaintiff's claim ... failed under the heightened scrutiny required by [RLUIPA], it cannot succeed under the rational basis standard" applicable to Free Exercise Clause claims). Conversely, because plaintiff's claims do succeed under RLUIPA, there is no need for the court to consider whether they also succeeds under the lower level of scrutiny afforded by the Free Exercise Clause. This is especially so given this court's overarching obligation to avoid the resolution of constitutional questions to the extent possible. *See Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question, although properly presented by the record, if there is also present some other ground upon which the case may be disposed of."). It is well-established that "[t]he appropriate exercise of judicial power requires that important constitutional issues not be decided unnecessarily where narrower grounds exist for according relief." *Communist Party of Ind. v. Whitcomb*, 414 U.S. 441, 452, 94 S.Ct. 656, 38 L.Ed.2d 635 (1974); *see also Jones v. Bates*, 127 F.3d 839, 856 (9th Cir.1997) (describing *Ashwander*'s "basic teaching" as "the need to abstain from deciding fundamental constitutional questions prematurely, and perhaps unnecessarily."). Similarly, plaintiff's facial Equal Protection Clause claim is foreclosed for the same reasons as its equal terms and exclusion limitations

claims, and its as-applied claim, under *Ashwander*, need not be reached.

## V.

## CONCLUSION

Accordingly, the court hereby ORDERS as follows:

1. The parties' cross-motions for summary judgment are GRANTED in part and DENIED in part as follows:

   a. As to plaintiff's "substantial burden" claim under RLUIPA, plaintiff's motion is GRANTED and defendants' motion is DENIED. Judgment shall be entered against each of the defendants with prejudice.

   b. As to plaintiff's "equal terms" and "exclusion limitation" claims under RLUIPA, plaintiff's motion is DENIED and defendant's motion is GRANTED. Judgment shall be entered against the plaintiff with prejudice.

   c. Plaintiff's claims under the Free Exercise Clause and the Equal Protection Clause are DISMISSED AS MOOT.

2. The May 21, 2002, decision of the Sutter County Board of Supervisors denying plaintiff's January 9, 2002 application for a conditional use permit to build a temple is hereby DECLARED to be in violation of RLUIPA and is accordingly ANNULLED and SET ASIDE.

3. The court ORDERS the immediate approval and granting of plaintiff's application 02–01 for a conditional use permit, subject only to the appropriate conditions to which plaintiff has previously stipulated.

4. Plaintiff is AWARDED nominal damages in the sum of one dollar from each defendant.

5. The Clerk is directed to ENTER judgment accordingly and CLOSE the case.

IT IS SO ORDERED.